THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. CHAD WAHL, Defendant-Appellant.

Second District   No. 2—94—0635

Opinion filed December 12, 1996.—Rehearing denied January 14, 1997.

[1]Justice Egan participated in the decision of this case prior to his retirement from the bench.

G. Joseph Weller and Thomas A. Lilien, both of State Appellate Defender's Office, of Elgin, for appellant.

David R. Akemann, State's Attorney, of St. Charles (William L. Browers and Diane L. Campbell, both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE HUTCHINSON delivered the opinion of the court:

Defendant, Chad Wahl, appeals the denial of his motion for a new trial and his motion to reduce or reconsider his sentence. Following a jury trial, defendant was convicted of six counts of aggravated criminal sexual abuse (720 ILCS 5/12—16(C)(1)(i) (West 1992) (now 720 ILCS Ann. 5/12—16(C)(1)(i) (Smith-Hurd Supp. 1996))), one count of aggravated criminal sexual assault (720 ILCS 5/12—

14(b)(1) (West 1992) (now codified, as amended, at 720 ILCS Ann. 5/12—14(b) (Smith-Hurd Supp. 1996))), and one count of attempted aggravated criminal sexual assault (720 ILCS 5/8—4(a), 12—14(b)(1) (West 1992) (now codified, as amended, at 720 ILCS Ann. 5/8—4(a), 12—14(b) (Smith-Hurd Supp. 1996))). Defendant was found not guilty of three counts each of aggravated criminal sexual assault and aggravated criminal sexual abuse. The trial court sentenced defendant to 4 years' imprisonment for each count of aggravated criminal sexual abuse, 10 years' imprisonment for the count of aggravated criminal sexual assault, and 7 years' imprisonment for the count of attempted aggravated criminal sexual assault. All sentences were to run consecutively. In total, defendant was sentenced to a 41-year term of imprisonment. This appeal timely followed the denial of defendant's post-trial motions.

On appeal, defendant contends (1) the trial court erred by denying his motion to suppress statements made to Illinois State Police Detective Sergeant Thomas O'Donnell on March 11, 1992; (2) that concerning the psychological makeup of the complainants: (a) the State improperly presented evidence on post-traumatic stress disorder in such complainants, and (b) defendant's due process rights were violated because he was denied discovery concerning the psychological histories of the complainants; (3) the trial court erred by limiting bias impeachment of O'Donnell; (4) defendant should have received discovery concerning a civil suit filed by several of the complainants; (5) the trial court abused its discretion in imposing sentence; and (6) the trial court improperly imposed a sexual assault fine on defendant (see 730 ILCS 5/9—1.7(b)(1) (West 1994) (now 730 ILCS Ann. 5/9—1.7(b)(1) (Smith-Hurd Supp. 1996))). We affirm in part and we vacate in part.

The present case arises from incidents at a home for dependent children (the Home) beginning in summer 1991 and continuing to the date of defendant's arrest. Children living in the Home are assigned to group residence halls on the basis of each child's age and sex. Each residence hall is supervised by two live-in houseparents. The houseparents have at least one day off per week; on these days, the Home provides relief houseparents. Typically, there is one female and one male houseparent. The houseparents supervise their assigned residence halls and provide the children with structure, guidance, discipline, and parental care. Additionally, the houseparents accompany the children to and from school and assist them with their homework. The houseparents function as surrogate parents and, therefore, are the children's primary caregivers.

On October 20, 1990, the Home hired defendant as a housepar-

ent. For the first three months of his employment, defendant served as a houseparent in a hall for toddlers. From January to the middle of July 1991, defendant was a relief houseparent for a number of halls housing elementary school children. From July to October 1991, he was a relief houseparent in high school halls. Defendant served in this capacity until being assigned to New Jersey Hall in October 1991 as a permanent houseparent. Jane Bowen was the other permanent houseparent. New Jersey Hall is a residence hall for boys in their early teen years.

As a reward for performing their chores, the boys were permitted by Bowen and defendant to "camp out" in the living room of New Jersey Hall on Friday and Saturday nights. Camp-outs consisted of playing video games and watching videotapes of movies rented by Bowen and defendant. The boys were then permitted to sleep on the living room floor in front of the television set. According to Bowen, the rules required one of the houseparents to sleep in the living room with the boys on camp-out nights.

O'Donnell began his investigation of defendant on March 5, 1992. Accompanying O'Donnell were Assistant State's Attorney Lynn Mirabella and Mary Heywood of the Department of Children and Family Services.

O'Donnell and defendant met at approximately 6 p.m. on March 5, 1992, in the office of the Home's superintendent. According to O'Donnell, people "were coming in and out" of the office throughout his conversation with defendant. O'Donnell informed defendant that "some students had said that he had touched them improperly." In response to defendant's query concerning who had made the allegations, O'Donnell replied he had to speak to the students before discussing the allegations with defendant. Defendant responded that he would wait and speak to O'Donnell after the officer completed his discussions with the students.

O'Donnell, along with Mirabella and Heywood, spoke with R.F. and E.S. between 6 p.m and 8 p.m. R.F. and E.S. were interviewed separately. O'Donnell did not participate in the interview of E.S.; Mirabella and Heywood interviewed E.S.

At approximately 8 p.m. O'Donnell summoned defendant. The officer took defendant to a counselor's office. There O'Donnell began the interview by reading defendant the *Miranda* warnings (see *Miranda v. Arizona*, 384 U.S. 436, 467-74, 16 L. Ed. 2d 694, 720-23, 86 S. Ct. 1602, 1624-28 (1966)) from a card. O'Donnell asked defendant if he understood his rights; defendant replied "yes." The officer then asked defendant if he wished to talk; again, defendant replied "yes." O'Donnell told defendant that R.F. and E.S. said defendant had

touched each of their penises; further, defendant had sucked on R.F.'s penis, according to the boy, after he had taken a shower.

While initially denying having any type of sexual contact with anyone at the Home, after approximately 30 minutes defendant admitted to having sexual contact with both R.F. and E.S. During a movie camp-out—in either June or July 1991, while defendant was a relief houseparent at Dixie Hall—he and R.F. were sleeping under the same blanket. Defendant accidentally touched R.F.'s penis. R.F.'s penis was erect and protruding through his pajamas at the time. Defendant moved his hand up and down R.F.'s penis for two or three minutes until someone bumped into defendant. Subsequently, defendant intentionally touched and stroked R.F.'s penis while the two slept under a blanket, apparently during a movie camp-out; defendant stated R.F. rubbed the defendant's pants at the same time. Defendant told O'Donnell he stopped after realizing what he was doing was wrong. Defendant denied sucking R.F.'s penis.

O'Donnell asked defendant if he had touched any other children in a sexual manner. According to defendant, he had touched K.W. on more than one occasion. Apparently, these incidents occurred before R.F. moved into Dixie Hall. Defendant said he and K.W. had been lying underneath a blanket watching television and "were cuddling very close." Defendant reached down and touched K.W.'s penis. According to defendant, K.W.'s penis was erect and protruding through his pajamas. Defendant stroked K.W.'s penis for two or three minutes. Defendant stated he engaged in this sort of conduct with K.W. on another occasion. O'Donnell promised that he would inform the State's Attorney of defendant's cooperation. At the conclusion of the interview, O'Donnell arrested defendant.

On March 11, 1992, O'Donnell visited the Kane County jail to interview defendant about further information the officer had obtained from other boys. O'Donnell and defendant seated themselves in a "small" interview room. Their conversation began with small talk. According to the officer, he then read defendant the *Miranda* warnings. O'Donnell stated he asked defendant if he had an attorney. The officer testified defendant said "somebody had come by the jail, he didn't know who the person was, told him that that person represented an attorney that was going to represent [defendant]." O'Donnell rose and started to leave the interview room. On cross-examination, O'Donnell admitted he got up to leave because he believed defendant had an attorney and would not discuss the case. Before O'Donnell left the interview room, but after he had stood up to depart, he told defendant that he would not be able to tell the State's Attorney defendant had been cooperative. This was because

since March 5, 1992, O'Donnell had learned defendant "had not been completely truthful." Defendant replied he had been nervous and may have forgotten some things. O'Donnell said he had spoken to several other children in the interim of March 5, 1992, and March 11, 1992. In reply, defendant asked with whom the officer had spoken. O'Donnell testified that he told defendant he "had talked to [T.W.], [C.M.] and other children." According to O'Donnell, defendant replied, "[T.W.] was not one of them." Defendant also expressed a desire to get out of jail and a need for counseling. He also opined that "at least I didn't hurt any of them." O'Donnell replied he thought defendant had hurt them psychologically. Defendant then "hung his head" and looked downward.

Defendant's recollection of the March 11, 1992, meeting differed somewhat from O'Donnell's. Defendant testified O'Donnell did not read defendant the *Miranda* warnings. The officer walked into the interview room and declared defendant had not been truthful. Defendant asserted, "Well, I want to talk to my attorney." While getting up to leave, O'Donnell asked defendant if he could afford an attorney. Defendant replied he did not know. O'Donnell then asked if defendant had an attorney yet. Defendant said he thought he had been assigned an attorney and that somebody had visited him in jail.

Before trial, defendant filed a motion to suppress all statements he made after being taken into custody on March 5, 1992. The trial court ruled that all of the March 5, 1992, statements were admissible. Defendant does not contest this ruling. As for the March 11, 1992, statements, the court suppressed any statements relating to the charges upon which defendant had already been incarcerated. The trial court stated:

"My findings of fact are *** that *** defendant was represented by the attorneys from the Public Defender's Office. That number two, [defendant] advised [O'Donnell] prior to making any statements that in fact [defendant] is represented by an attorney. Number three, I believe that [O'Donnell] made the statements before leaving in an attempt to elicit additional incriminating comments from *** defendant."

After making these findings, the court permitted the parties to submit memoranda of law on the propriety of O'Donnell's questioning in light of the court's findings. After reading the memoranda, the court allowed any statements regarding charges initiated after March 11, 1992. Based on the report of proceedings for March 4, 1993, the trial court seemingly based its ruling exclusively on sixth amendment grounds (see, *e.g.*, *Maine v. Moulton*, 474 U.S. 159, 180, 88 L. Ed. 2d 481, 498, 106 S. Ct. 477, 489 (1985) (sixth amendment right to

counsel attaches to only those charges pending at the time evidence is elicited from a defendant)), notwithstanding the fifth amendment arguments set forth in the parties' memoranda.

J.C.(I) (two of the complainants in the present case have the initials "J.C."; for the sake of clarity they will be referred to as J.C.(I) and J.C.(II)) was born on August 2, 1982. J.C.(I) testified defendant had been his relief parent at New Jersey Hall in summer 1991. J.C.(I) stated that one night he entered defendant's room in New Jersey Hall and defendant put his hand on J.C.(I)'s penis and stroked up and down. This continued for "five to ten minutes." According to J.C.(I), this type of conduct occurred "[f]ive to four or so" times.

Defendant continued his sexual contact with J.C.(I) after defendant became a permanent houseparent in New Jersey Hall. J.C.(I) testified defendant "put his finger up my butt" four or five times. On at least one occasion, defendant wiped a liquid on J.C.(I)'s anus before inserting his finger. These incidents occurred in defendant's room in New Jersey Hall. Defendant also stroked J.C.(I)'s penis during a movie camp-out. At approximately 11 p.m., J.C.(I) entered defendant's room. At defendant's behest, J.C.(I) pulled down his pants and lay on his stomach. Defendant again used a liquid of some type on J.C.(I)'s anus. J.C.(I) felt defendant's weight on his back. J.C. thought defendant was attempting to insert his penis in J.C.(I)'s anus. J.C.(I) felt a pain and pulled away. He observed that defendant had taken off his shorts and he had an erection. J.C.(I) dressed and left defendant's room. On a different night, defendant told J.C.(I) to pull down his pants and J.C.(I) refused. Defendant repeated the order and J.C.(I) complied. Defendant then sucked on J.C.(I)'s penis until he ejaculated. J.C.(I) testified this occurred on one other occasion.

J.C.(I) stated he did not report these events prior to March 5, 1992, because he was afraid. Once, J.C.(I) testified, defendant had said that if J.C.(I) informed on defendant he would hurt J.C.(I). His fear only subsided after defendant was removed from the Home.

S.W. was born on September 1, 1979. He had lived in New Jersey Hall during 1991 and 1992. S.W. testified defendant had first touched S.W. sexually while defendant was serving as a relief houseparent in New Jersey Hall. This first incident occurred during a camp-out. According to S.W., he and the other children had gathered around the television set to watch the film, "Who Framed Roger Rabbit." S.W., having just taken a shower, was lying on the floor wearing underwear, shorts, and socks. At about 8 p.m. or 8:30 p.m., defendant lay down beside S.W., placed his blanket over S.W.'s blanket, and started touching S.W.'s penis through his shorts. S.W. jumped up, ran away, and hid from defendant. Defendant located S.W.'s hiding place, picked

him up, carried him back to the living room, and laid him down. Defendant again placed the blankets over himself and S.W. S.W. fell asleep at approximately 12 a.m. When he awoke, S.W. discovered defendant was stroking S.W.'s penis.

According to S.W., defendant continued to have sexual contact with S.W. after defendant became a permanent houseparent at New Jersey Hall. S.W. described a Boy Scout camping trip on which defendant, another houseparent, and the Home's dean, Joseph Dinges, took the children. S.W. thought Dinges was in his tent doing paperwork. S.W. and several other children were sleeping around a campfire. Defendant unzipped S.W.'s "camping bag," reached under his shorts, and began to stroke his penis. S.W. fell asleep. Returning from the camping trip by bus, S.W. took a seat in the back of the bus. Defendant and another child joined S.W. The three took turns playing a hand-held video game. On cross-examination S.W. stated defendant touched S.W.'s penis while they sat on the bus. S.W. testified the other child had left the back of the bus to talk with "some kids up front."

S.W. also testified defendant touched him sexually while S.W. was in his dorm room. This incident occurred on a Saturday night after defendant was a permanent houseparent. Defendant sat on S.W.'s bed. According to S.W., defendant "said he was cold so he got under my bedspread." S.W. got out of bed, went to the rest room, and left defendant talking to the other children in the dorm room. When S.W. returned from the rest room, defendant sat up on S.W.'s bed. S.W. climbed back into bed; defendant climbed back into S.W.'s bed. Defendant began touching S.W.'s penis through his clothes. Again, S.W. got out of bed and left the dorm room.

S.W. related an incident occurring during a movie camp-out in fall 1991. After getting a drink, S.W. lay down behind the rest of the children near the couch. Defendant was lying behind S.W.; S.W. fell asleep. When S.W. awoke, defendant had reached inside S.W.'s clothes and was touching his penis. S.W. testified that he tried to move away. Defendant prevented this by holding S.W. down. S.W.'s shorts and underwear were pulled down by defendant, who moistened his finger, and inserted his finger in S.W.'s anus. S.W. testified this hurt. He pushed defendant away. According to S.W., defendant said "he was trying to loose me up [sic] and everything." S.W. got up and moved to the couch to sleep. S.W. stated this type of conduct occurred twice.

S.W. testified to another specific incident occurring approximately a week or two before New Year's Eve during a "movieless" camp-out. S.W. and the other children had been playing video games on the

television in the living room. S.W. fell asleep under his blanket. Upon awakening, S.W. discovered his shorts were around his ankles and defendant was sucking on S.W.'s penis. Defendant also engaged in this type of conduct with S.W. on the Saturday night before defendant was arrested.

S.W. testified he did not tell Bowen about defendant's conduct until after he had been arrested because he was afraid. Defendant threatened S.W. According to S.W., the initial threat occurred the first time defendant touched S.W. in a sexual manner. S.W. testified, "[defendant] told me that if I told on him, that no one would believe me. That everyone would think I was lying. And he said that he knew where my family lives because he has my records and that if I told anybody that he'd checked [sic] on my family." On cross-examination, S.W. stated he was touched more than 40 times in a manner he did not like.

J.C.(II) was born on December 28, 1982. J.C.(II) moved into the Home in summer 1991. After three days in Arizona Hall, J.C.(II) was moved to Dixie Hall. Over J.C.(II)'s eight months at Dixie Hall, defendant served as a relief houseparent "about eight times." J.C.(II) testified he was touched by defendant during defendant's fourth stint as a relief houseparent. The children were in the living room watching "[a]n airplane movie." J.C.(II) fell asleep on the living room couch. When he awoke, defendant was lying behind the boy on the couch. Defendant had his hands in J.C.(II)'s shorts and was touching his penis. This continued for two minutes. According to J.C.(II), defendant asked if his actions bothered J.C.(II). He responded it did bother him, left the couch, and went upstairs to his room.

C.M. was born on July 5, 1979. C.M. moved into Dixie Hall in fall 1991 and was living there in November 1991. Defendant was one of several relief houseparents during C.M.'s stay in Dixie Hall. C.M. testified that in either June or July 1991, defendant stroked his penis. C.M. and the rest of the children had gathered in the living room to watch the film, "Rambo 3." Defendant was lying on the couch. When the film began, C.M. moved from a chair to the couch to be next to defendant. C.M. testified he moved "[b]ecause I liked [defendant] and I was close to him." Defendant and C.M. were underneath a blanket when defendant reached down C.M.'s shorts and underwear and began stroking his penis. This continued for three to five minutes until C.M. ejaculated. He then went upstairs to change clothes. According to C.M., defendant said he had never done that sort of thing before and that he was not gay. C.M. testified to having observed defendant and another child, G.J., "wrestle around with a cover over them." C.M. also stated he heard the sound of "underwear snapping" coming from the vicinity of defendant and G.J.

R.F. was born on January 30, 1982. R.F. lived in Dixie Hall in summer 1991. According to R.F., defendant often served as a relief houseparent. In June 1991, the regular Dixie Hall houseparents took a 12-day vacation. During this period, defendant served as the sole houseparent. At approximately 3 p.m. of the second day of defendant's stint as relief houseparent, he and several of the children were gathered in the living room watching television. R.F. testified he was lying on the floor. Defendant entered the living room and covered himself and R.F. with a blanket. R.F. testified that defendant began to rub R.F.'s "foreskin up and down." This type of conduct was repeated on a separate occasion at sometime during the 12-day period.

Additionally, R.F. stated defendant had put his mouth on R.F.'s penis after he had showered. This occurred in the basement. R.F. had finished showering. Defendant then dried R.F. off using a towel. According to R.F., defendant laid R.F. on a table. Defendant then placed his mouth on R.F.'s penis.

K.W. was born on January 13, 1980. K.W. lived in Dixie Hall in summer 1991. During this summer, defendant served as a relief houseparent during the vacation of the regular Dixie Hall houseparents. According to K.W., he, several of the other children, and defendant were watching a film in the living room. It was evening. K.W. was lying down on his side in front of the couch. Defendant was lying in front of K.W. K.W. was wearing his pajamas. K.W. testified defendant "felt my penis." When asked how defendant did this, K.W. responded, "Moving his hand up and down." Defendant then whispered to K.W., "Don't tell anybody." K.W. stated defendant repeated this sort of conduct "two or three" times following the initial incident.

Although nine complainants testified for the State, we have only summarized the testimony of those the jury determined had been abused or assaulted by defendant. Additional facts will be set forth within the body of the opinion as needed.

Defendant first argues that the trial court erred by denying his motion to suppress the statements he made to O'Donnell on March 11, 1992. Defendant bases this argument on both his sixth amendment right to counsel and his fifth amendment privilege against self-incrimination. We examine each basis in turn.

■ Defendant asserts that his March 11, 1992, statements were elicited in violation of his sixth amendment right to counsel. A defendant represented by counsel may not be questioned concerning charges upon which adversarial judicial criminal proceedings have commenced. See, *e.g.*, *People v. Crane*, 145 Ill. 2d 520, 531 (1991), cit-

ing *McNeil v. Wisconsin*, 501 U.S. 171, 175-76, 115 L. Ed. 2d 158, 166-67, 111 S. Ct. 2204, 2207 (1991). Further, a defendant does not waive the sixth amendment right to counsel when a police officer reads the *Miranda* warnings to the defendant, who then acquiesces to the officer's questioning. See *Michigan v. Jackson*, 475 U.S. 625, 631-35, 89 L. Ed. 2d 631, 639-41, 106 S. Ct. 1404, 1408-11 (1986). However, the sixth amendment right to counsel—unlike the fifth amendment privilege against self-incrimination protected by the prophylactic rule of *Miranda* and its progeny—is offense specific. Therefore, simply because a defendant is represented by counsel on a charged offense does not prevent the authorities from questioning the defendant about other unrelated offenses. See, *e.g.*, *People v. Maxwell*, 148 Ill. 2d 116, 128-29 (1992).

Under a traditional sixth amendment analysis, O'Donnell's conduct during the March 11, 1992, interview did not violate defendant's right to counsel. On March 11, 1992, defendant had already been charged with aggravated criminal sexual abuse against both R.F. and K.W. Therefore, defendant's comments that "[T.W.] was not one of them" and "at least I didn't hurt any of them" were admissible as to all charges other than those already pending concerning R.F. and K.W. The trial court ruled accordingly.

■ However, defendant argues that the offenses against J.C.(I), C.M., S.W., R.F., J.C.(II), and K.W. were so closely related that defendant's sixth amendment right to counsel attached to the uncharged offenses. The Illinois Supreme Court has interpreted the United States Supreme Court's decision in *Moulton* as implicitly standing for the proposition that the "sixth amendment rights of one formally charged with an offense extend to offenses *closely related* to that offense and for which a defendant is subsequently formally accused." (Emphasis added.) *People v. Clankie*, 124 Ill. 2d 456, 463 (1988); see also *United States v. Cooper*, 949 F.2d 737, 743 (5th Cir. 1991) (stating the standard as being whether the charged and uncharged offenses are "inextricably intertwined"). Neither the degree nor the nature of the closeness of the charged and uncharged offenses has been set forth by either the Illinois or the United States Supreme Court. *Clankie*, 124 Ill. 2d at 463-64 (failing to state an evaluative standard because "even if[—]for exclusion of the evidence regarding the subsequently charged offense[—]the two offenses must be *extremely* closely related, the required relationship exists in this case" (emphasis in original)).

It is vital to understand precisely the interest protected by the closely related offenses exception to the offense-specific sixth amendment right to counsel. The exception has been adopted in one form or

another by a number of both state and federal courts. See *United States v. Kidd*, 12 F.3d 30, 33 (4th Cir. 1993); *Hendricks v. Vasquez*, 974 F.2d 1099, 1104-05 (9th Cir. 1992); *United States v. Carpenter*, 963 F.2d 736, 740-41 (5th Cir. 1992); *United States v. Hines*, 963 F.2d 255, 257-58 (9th Cir. 1992); *Cooper*, 949 F.2d at 743-44; *United States v. Micheltree*, 940 F.2d 1329, 1342-43 (10th Cir. 1991); *United States v. Richardson*, 837 F. Supp. 570, 574-75 (S.D.N.Y. 1993); *United States v. Louis*, 679 F. Supp. 705, 709-10 (W.D. Mich. 1988); *State v. Tucker*, 137 N.J. 259, 278, 645 A.2d 111, 121 (1994); *In re Pack*, 420 Pa. Super. 347, 355-56, 616 A.2d 1006, 1010-11 (1992); see also *Whittlesey v. State*, 340 Md. 30, 50-57, 665 A.2d 223, 232-36 (1995) (providing an excellent overview of this issue, while declining to decide whether the sixth amendment right to counsel may ever attach to an uncharged offense); 1 W. LaFave & J. Israel, Criminal Procedure § 6.4(e), at 96, 97 n.90.2 (Supp. 1991) (discussing *Clankie* in terms of *Moulton*). However, few of these cases discuss the goal of the closely related offenses exception. We do not view the goal as being shielding a defendant from all questioning concerning a type, class, or category of offense for which a charge is pending. See *Kidd*, 12 F.3d at 33 (notwithstanding defendant's arrest on July 2, 1992, for selling cocaine base to government informants, exception did not apply to defendant's sale of cocaine base to a different undercover informant on August 26, 1992, while defendant was out on bond awaiting trial on the July 2, 1992, charge); *Hines*, 963 F.2d at 257 (stating that when the time, place, and persons involved are all different, a charged firearm possession offense is not closely related to a subsequently charged firearm possession offense). Rather, the true purpose of *Clankie*'s exception is to prevent the State from interrogating a defendant about a distinct course of criminal conduct—one capable of supporting a new charge—outside of the presence of the defendant's attorney, when the fruits of a successful interrogation will be admissible as substantive proof of the charges upon which adversarial judicial criminal proceedings have commenced. Put another way, *Clankie* prohibits interrogation of a defendant on an uncharged criminal offense if the interrogation functions as a continuation of the investigation of the factual transaction forming the basis of the previously charged offense.

■ There is no bright line test for whether the closely related offenses exception applies. Our survey of the cases discussing the exception indicates that three predominant factors should be examined. First, a court should determine whether the charged and uncharged offenses were committed against the same individual or entity. Second, a court should consider the amount of time between the acts

forming the basis for the charged and uncharged offenses. The briefer the time period between the acts giving rise to the charged and uncharged offenses, the greater the likelihood the facts were part of the same factual transaction. This, in turn, militates in favor of finding that the sixth amendment right to. counsel has attached to the uncharged offense. Third, a court should be watchful for any evidence that the investigative authorities of a second sovereign interrogated the defendant—in an attempt to elicit evidence concerning the facts forming the basis of an offense charged by the first sovereign—so the second sovereign might bring a similar charge based on the same factual transaction. A discussion of these factors should form the basis of a court's analysis of the closely related offenses exception.

The most important of the factors is the identity of the victims or targets of the offenses. If the uncharged offense was committed against the same individual or entity, a strong possibility exists that the closely related offenses exception may apply. See *Brewer v. Williams*, 430 U.S. 387, 389-98, 51 L. Ed. 2d 424, 431-36, 97 S. Ct. 1232, 1235-38 (1977) (holding that use of defendant's admission that he killed his abductee was violative of sixth amendment right to counsel where admission was made after defendant was indicted for abducting the victim and before defendant's attorney met with defendant); *Clankie*, 124 Ill. 2d at 457, 466 (applying exception where defendant was convicted of three instances of burglarizing the same person's home).

*In re Pack* provides a particularly good illustration of the importance of the identity of the victims or targets of the offenses. In *In re Pack* the defendant was arrested on March 22, 1991, for theft, receiving stolen property, and criminal conspiracy. The defendant allegedly stole clothing that morning from a store located at 135 South 52nd Street. After being read the *Miranda* warnings, the defendant asserted his right to remain silent. Counsel was appointed. On April 1, 1991, the State obtained a warrant for the defendant's arrest, adding the charge of burglary to those pending on the March 22, 1991, incident. Once again the defendant was read the *Miranda* warnings. However, this time he made a statement incriminating himself in the March 22, 1991, break-in; additionally, the statement contained an admission by the defendant that he had participated in an earlier break-in at a separate location on South 52nd Street.

The court held that the April 1, 1991, interrogation had violated defendant's sixth amendment right to counsel. *In re Pack*, 420 Pa. Super. at 355, 616 A.2d at 1010. The court stated "the Sixth Amendment right to counsel, which is offense specific, [applies] to all the of-

fenses arising from the same incident for which a defendant is charged." *In re Pack*, 420 Pa. Super. at 356, 616 A.2d at 1010-11. "To hold otherwise, would allow the [State] to circumvent the Sixth Amendment right to counsel merely by charging a defendant with additional related crimes." *In re Pack*, 420 Pa. Super. at 356, 616 A.2d at 1011. We believe it is this circumvention that the closely related offenses exception is designed to prevent. Simply because a defendant repeatedly commits the same type of offense in the same fashion does not alter the offense-specific nature of the sixth amendment right. The exception does not exist to shelter a defendant from otherwise proper police questioning concerning a defendant's favored criminal activity or *modus operandi*. In this context, we note the *In re Pack* court did not require the suppression of the defendant's comments concerning the earlier break-in on South 52nd Street. *In re Pack*, 420 Pa. Super. at 356, 616 A.2d at 1011.

■ We hold that the charges filed after O'Donnell's March 11, 1992, meeting with defendant were not closely related to the pre-March 11, 1992, charges. Each of the post-March 11, 1992, charges concerned different victims from the pre-March 11, 1992, charges. Additionally, defendant's offenses were committed over a time span ranging from early June 1991 to March 1992. The testimony establishes beyond a reasonable doubt that the instances of defendant's abuse and assault were neither continuous nor simultaneous. They were interspersed among the ordinary activities of life at the Home: school, sports, chores, films, and camping trips. Finally, we note that the present case does not implicate the problem of separate sovereigns attempting to bring similar charges against a defendant based on the same operative facts.

For the foregoing reasons, the judgment of the circuit court of Kane County is affirmed in part and vacated in part.

Affirmed in part and vacated in part.

McLAREN, P.J., and RATHJE, J., concur.