STATE of Wisconsin, Plaintiff-Respondent-Petitioner,

v.

Todd D. DAGNALL, Defendant-Appellant.

Supreme Court

*No. 98–2746–CR. Oral argument February 8, 2000.—Decided July 6, 2000.*

2000 WI 82

(Also reported in 612 N.W.2d 680.)

340

341

For the plaintiff-respondent-petitioner the cause was argued by *James M. Freimuth*, assistant attorney general, with whom on the briefs was *James E. Doyle,* attorney general.

For the defendant-appellant there was a brief and oral argument by *John D. Lubarsky*, assistant state public defender.

¶ 1. DAVID T. PROSSER, J. The State of Wisconsin (State) seeks review of a published decision of the court of appeals, *State v. Dagnall*, 228 Wis. 2d 495, 596 N.W.2d 482 (Ct. App. 1999). The court of appeals reversed a decision of the Circuit Court for Dane County, Patrick J. Fiedler, Judge, denying the motion of Todd D. Dagnall (Dagnall) to suppress incriminating statements he made to detectives. The circuit court held that the statements were not obtained in violation of the Sixth Amendment because Dagnall had not personally, unambiguously, and unequivocally invoked his right to counsel prior to answering questions. After his motion was denied, Dagnall pled no contest to the charge of first-degree intentional homicide by use of a dangerous weapon, as party to the crime.

¶ 2. Dagnall later appealed the judgment of conviction, challenging the decision to deny his suppression motion. He argued that a letter from his attorney to the sheriff's department, acknowledging

that Dagnall had been arrested in Florida and directing that no one should question Dagnall about the homicide, as well as Dagnall's own remark to detectives that, "My lawyer told me that I shouldn't talk to you guys," constituted a proper invocation of the Sixth Amendment right to counsel. The court of appeals agreed and reversed the judgment. The court held that Dagnall's remark, when considered together with the admonitions in the attorney's letter and the detectives' conceded awareness of that letter, would lead a reasonable police officer to understand that Dagnall was invoking the right to counsel. The court therefore remanded the cause to the circuit court for trial or further proceedings with directions to grant Dagnall's motion to suppress the statements elicited by the detectives.

¶ 3. The State presents one issue for review, whether Dagnall properly invoked the Sixth Amendment right to counsel. Stated this way, the issue presupposes that one must "invoke" the right to counsel to give it effect, even after an attorney has been "retained." We also address a corollary to the central issue, whether a defendant who has counsel may waive the right to counsel by talking to detectives after receiving *Miranda* warnings.

¶ 4. We hold that Dagnall was not required to invoke the right to counsel in this case because he had been formally charged with a crime and counsel had been retained to represent him on that charge. Because Dagnall was an accused person under the Sixth Amendment who had an attorney to represent him on the specific crime charged, and because the attorney had informed the police of his representation of Dagnall and admonished them not to question his client about that crime, any subsequent questioning

346

about that crime was improper. In addition, we conclude that Dagnall did not waive his Sixth Amendment right to counsel by talking to the detectives after he had been given the *Miranda* warnings. We therefore hold that, under these facts, Dagnall's motion to suppress the inculpatory statements should have been granted. For these reasons and the reasons set forth below, we affirm the decision of the court of appeals.

## FACTS

¶ 5. The facts relevant to this appeal are not in dispute. On October 14, 1997, the Dane County District Attorney's office issued a criminal complaint charging Dagnall with one count of first-degree intentional homicide, contrary to Wis. Stat. § 940.01(1). The complaint alleged that on October 13 Dagnall and another individual, Christopher E. Murray, entered the residence of Norman G. Gross in the Village of DeForest and beat Gross to death with baseball bats. The circuit court found probable cause to believe that Dagnall committed the crime and authorized a warrant for his arrest. Dagnall was promptly arrested in Fort Myers, Florida, at the request of the Dane County Sheriff's Department.

¶ 6. That same day, October 14, Madison Attorney James H. Connors delivered a letter to the sheriff's department, in which he stated:

To Whom It May Concern:
 Please be advised that I represent Todd Dagnall who has been arrested in the State of Florida per your instructions.
 It is my understanding that Mr. Dagnall is a suspect in a homicide case here in Dane County.
 Please be advised that I do not want my client questioned by anyone concerning criminal matters

and, more particularly, the homicide in which he is a suspect here in Dane County.

¶ 7. The following day, October 15, two officers, Kevin Hughes (Hughes) of the sheriff's department and Nick Tomlin (Tomlin) of the Village of DeForest, traveled to Florida, where they contacted Dagnall at the Lee County Jail. Detective Hughes later testified that he was aware that the sheriff's department had received the letter from Attorney Connors, but he did not believe the letter barred him from initiating a conversation with Dagnall because only a defendant "can exercise his constitutional rights."

¶ 8. Hughes explained that in questioning Dagnall, he hoped Dagnall would provide a statement about the homicide. Hughes candidly stated that he wanted "to try to get him to talk about the case."

¶ 9. The detectives informed Dagnall that their purpose was to question him about the homicide. Hughes recalled his impression of Dagnall, stating, "Basically [ ] he didn't want to talk to us [at] all—actually what he told us, that his lawyer told him that he shouldn't be talking to us, were his words, or something to that effect. That he'd been advised by counsel not to talk to us." Hughes conceded that Dagnall remarked, "My lawyer told me that I shouldn't talk to you guys."

¶ 10. The October 14 criminal complaint described Detective Hughes as having interviewed Christopher Murray and having secured from him a statement that he and Dagnall went to the residence of Norman Gross, where both of them hit Gross with baseball bats. In Florida the next day, Hughes and Tomlin:

> explained to [Dagnall] that we ha[d] been con-
> ducting interviews and talking to other people
> regarding the homicide and that it was his decision
> as to whether or not he wanted to talk to us and we
> would like to read him his rights, and after he heard
> his rights, he could make a decision as to whether or
> not he wished to provide a statement.

Hughes told Dagnall that the detectives were inter-
ested in obtaining his account of what took place, and
that it was Dagnall's decision whether or not to talk to
them. Hughes read the *Miranda* rights to Dagnall,[1]
and then asked Dagnall, "Realizing that you have these
rights, are you now willing to answer questions or
make a statement?" Hughes testified that Dagnall said
he "would talk to us until he felt that he would be at a
point where he would discriminate [*sic*] against
himself."[2]

¶ 11. The detectives questioned Dagnall for
slightly more than one hour. During this interview,
Dagnall never requested an attorney. The detectives
made no promises or threats.

¶ 12. On October 16, the detectives again spoke
with Dagnall, this time while they waited with Dagnall
at the Fort Myers airport for a flight that would trans-
port Dagnall back to Wisconsin. Hughes asked Dagnall
if he would answer some additional questions about the

---

[1] *Miranda v. Arizona*, 384 U.S. 436 (1966). The detectives
informed Dagnall of his *Miranda* rights using a "standard Wis-
consin Department of Justice Rights card."

[2] At the suppression hearing, neither the State nor defense
counsel drew attention to Dagnall's use of the word "discrimi-
nate," rather than "incriminate," but the word "discriminate"
was faithfully put in quotation marks in Hughes's report to the
sheriff's department, signifying that Dagnall's misstatement
had been noticed by the officer.

homicide. Hughes again read Dagnall the *Miranda* rights, and Dagnall indicated that he understood the rights and would answer questions. The interview lasted ten minutes.

¶ 13. That same day, after flying to Madison, the detectives spoke once again with Dagnall. While being transported to the Dane County Jail at 10:40 p.m., according to Hughes, Dagnall explained that he believed his lawyer "would be mad at him for speaking" to the detectives, but he stated that "he was glad he told [the detectives] his version of the story." Dagnall said he felt it was necessary for him to give his version, because he was aware that the police had obtained information from others involved in the incident.

¶ 14. The next day, October 17, Hughes met with Dagnall at 7:40 a.m. in the Dane County Jail. Hughes advised Dagnall he had more questions because additional information about the investigation had been brought to his attention. Dagnall responded by asking whether Attorney Connors was aware that Dagnall was in town. When Detective Hughes replied that he "didn't know," he recalled that Dagnall said "it would probably be best to have his attorney present." No further questioning occurred, and Dagnall was returned to his cell.

¶ 15. On October 17, 1997, the district attorney's office filed an amended complaint, charging Dagnall with first-degree intentional homicide by use of a dangerous weapon as a party to the crime, contrary to Wis. Stat. §§ 940.01(1), 939.63(1)(a)2, and 939.05, and burglary while armed with a dangerous weapon as a party to the crime, contrary to Wis. Stat. §§ 943.10(1)(a), 943.10(2)(a), and 939.05.

## PROCEDURAL HISTORY

¶ 16. After the court entered a plea of not guilty on his behalf, Dagnall filed a motion seeking to suppress the incriminating statements he made to the detectives during the three interviews. Dagnall claimed the detectives violated his Sixth Amendment right to counsel when they questioned him after the sheriff's department received notice that Attorney Connors represented Dagnall.

¶ 17. The circuit court conducted an evidentiary hearing to decide the suppression motion.[3] It found that the Sixth Amendment right to counsel attached on October 14, the date on which authorities filed the criminal complaint; but it denied the suppression motion for four reasons. First, the court concluded that the letter from Attorney Connors did not constitute a personal invocation of Dagnall's right to counsel. The court stated that the right cannot be asserted on someone's behalf by an attorney because it must be invoked personally by the accused.

¶ 18. Second, the court concluded that Dagnall's remark, "My lawyer told me that I shouldn't talk to you guys," was not an unequivocal and unambiguous invocation of the right to counsel. The court made a finding that Dagnall was aware that he was represented by an attorney. The court also acknowledged that the police knew Attorney Connors represented Dagnall, and that Connors had instructed authorities not to question Dagnall. Nonetheless, the court determined that Dagnall's remark did not rise to the level of "an express statement that 'I don't want to talk to you guys.' "

---

[3] Dane County Sheriff's Detective Kevin Hughes was the only witness who testified at the suppression hearing.

¶ 19. Third, the court held that the questioning that transpired after Dagnall made the "my lawyer" remark was intended only to clarify what Dagnall wanted to do. The court reasoned that the detectives sought to determine whether Dagnall intended to invoke the right to counsel, and it found that the detectives assisted Dagnall with full information about his rights and decision-making authority. Furthermore, noting that standards for the Sixth Amendment are no higher than for the Fifth Amendment, the court determined that the detectives' reading of *Miranda* warnings for the Fifth Amendment "was likewise letter perfect for purposes of the Sixth Amendment."

¶ 20. Fourth, the circuit court concluded that Dagnall knowingly, freely, and voluntarily waived his Sixth Amendment right to counsel before the detectives elicited statements from him. Finding that Detective Hughes complied scrupulously with the requirements of the *Miranda* decision, the court determined that Dagnall was well informed about his rights when he volunteered his version of the story.

¶ 21. Following the denial of his suppression motion, Dagnall entered a plea of no contest to the charge of first-degree intentional homicide by use of a dangerous weapon, party to a crime.[4] On March 19, 1998, the circuit court accepted the plea and sentenced Dagnall to life imprisonment.[5] Dagnall appealed, argu-

---

[4] Dagnall entered the plea pursuant to a plea agreement with the State. The State moved to dismiss the charge of burglary while armed with a dangerous weapon as party to the crime and recommended that the circuit court establish a parole date no later than 40 years from the date of the homicide.

[5] The court subsequently also imposed a concurrent prison term of five years for the so-called weapons enhancer, because Dagnall had used a dangerous weapon in the commission of the

ing that the trial court erred when it denied his motion to suppress. *Dagnall*, 228 Wis. 2d at 496.

¶ 22. The court of appeals reversed, holding that Dagnall's incriminating statements should have been suppressed because detectives elicited the information after Dagnall properly invoked his Sixth Amendment right to counsel. *Id.* Although the court acknowledged that the parameters for the invocation of a Sixth Amendment right to counsel are not precise, it indicated that the Sixth Amendment offers broader protections for the accused than the Fifth Amendment provides for suspects. *Id.* at 503–05.

¶ 23. The court of appeals suggested that the evidentiary facts in this case must be taken together, not in isolation, to determine whether Dagnall effectively invoked the Sixth Amendment right. *Id.* at 500, 505. Borrowing from Fifth Amendment analysis, the court reasoned that under the "unambiguous request" rule fashioned for the Fifth Amendment in *Davis v. United States*, 512 U.S. 452, 459 (1994), suspects must articulate the "desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney." *Id.* at 503–04. The combination of circumstances here, namely the letter from Attorney Connors, the detectives' conceded awareness that Attorney Connors represented Dagnall, and Dagnall's remark, "My lawyer told me that I shouldn't talk to you guys," established that a reasonable officer would have understood that Dagnall was invoking the right to counsel for purposes of the Sixth Amendment. *Id.* at 505–06.

crime. Dagnall's first parole eligibility date was established as October 13, 2037, 40 years from the date of the homicide.

¶ 24. The court commended the circuit court's detailed and thoughtful decision from the bench but disagreed with the conclusion that the detectives' questioning of Dagnall meant to clarify Dagnall's intentions about invoking the right to counsel. On the contrary, the court of appeals found that Hughes and Tomlin planned to obtain a statement from Dagnall. *Id.* at 502 n.6, 502–03. Because the detectives knew Dagnall had retained legal assistance before the questioning, communicated with Attorney Connors about the crime, received advice not to speak with authorities, and placed the detectives on notice about his relationship with an attorney, the court concluded that the detectives should not have pursued the interview. *Id.* at 505–06.

¶ 25. The court of appeals found the State's contention that Dagnall waived the Sixth Amendment right to counsel meritless. *Id.* at 506 n.11. Having determined that Dagnall properly invoked his Sixth Amendment right to counsel, the court concluded that once a defendant invokes that right, all subsequent waivers are invalid. *Id.* (citing *Michigan v. Harvey*, 494 U.S. 344, 345 (1990); *Michigan v. Jackson*, 475 U.S. 625, 635 (1986)).

## STANDARD OF REVIEW

██

¶ 26. The essential issue in this case is whether police detectives violated Dagnall's Sixth Amendment right to counsel. This, in turn, entails a determination, under the facts presented, whether Dagnall consummated his Sixth Amendment right, and, if so, whether he later waived that right. To resolve an issue of constitutional fact requires a circuit court to apply constitutional principles to evidentiary or historical

facts. *State v. Martwick*, 2000 WI 5, ¶ 17, 231 Wis. 2d 801, 604 N.W.2d 552. A constitutional fact is one that is "decisive of constitutional rights." *Id.*

¶ 27. When reviewing issues of constitutional fact, an appellate court engages in a two-step analysis. *Id.* at ¶ 17. First, in assessing a circuit court's decision in a suppression matter, we apply a deferential, or clearly erroneous, standard to the circuit court's findings of evidentiary or historical facts. *Id.* at ¶ 18; *State v. Coerper*, 199 Wis. 2d 216, 221–22, 544 N.W.2d 423 (1996). Second, we review the court's application of constitutional principles to the historical facts. *Martwick*, 2000 WI 5, ¶ 17. On this second question, we are not bound by the determination of the circuit court. *State v. Kramar*, 149 Wis. 2d 767, 781, 784, 440 N.W.2d 317 (1989). Rather, we analyze the ultimate issue, the application of constitutional principles to the historical facts, independently. *Martwick*, 2000 WI 5, ¶ 18; *Kramar*, 149 Wis. 2d at 784.

## ANALYSIS

¶ 28. This case implicates an accused person's Sixth Amendment right to counsel in a pretrial, custodial setting. The Sixth Amendment to the United States Constitution, in pertinent part, provides that: "In all criminal prosecutions, the accused shall enjoy the right. . .to have the Assistance of Counsel for his defence."[6] The Supreme Court has applied the Sixth

---

[6] In full, the Sixth Amendment reads:

In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation; to be confronted

Amendment right to counsel to the states through the Due Process Clause of the Fourteenth Amendment.[7]

██

¶ 29. The Sixth Amendment right to counsel offers constitutional safeguards to the accused once the State initiates adversarial proceedings. The right protects the unaided layperson at critical confrontations with his expert adversary, the government, after the adverse positions of government and defendant have

with the witnesses against him; to have compulsory process for obtaining witnesses in his favor, and to have the Assistance of Counsel for his defence.

U.S. Const. amend. VI.

[7] Section 1 of the Fourteenth Amendment provides that "nor shall any State deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. In *Gideon v. Wainwright*, 372 U.S. 335, 342 (1963), the United States Supreme Court held that states must recognize those provisions of the Bill of Rights that are "fundamental and essential to a fair trial" and determined that the right to the assistance of counsel under the Sixth Amendment was a fundamental right.

Article I, § 7 of the Wisconsin Constitution also affords accused persons with the right to counsel. Article I, § 7 of the Wisconsin Constitution states:

**Rights of accused**. Section 7. In all criminal prosecutions the accused shall enjoy the right to be heard by himself and counsel; to demand the nature and cause of the accusation against him; to meet the witnesses face to face; to have compulsory process to compel the attendance of witnesses in his behalf; and in prosecutions by indictment, or information, to a speedy public trial by an impartial jury of the county or district wherein the offense shall have been committed; which county or district shall have been previously ascertained by law.

The State does not raise the issue whether Dagnall properly invoked his right to counsel under the state constitutional provision. Therefore, we do not address it.

solidified with respect to a particular crime. *McNeil v. Wisconsin*, 501 U.S. 171, 177–78 (1991) (citing *United States v. Gouveia*, 467 U.S. 180, 189 (1984)). The Sixth Amendment right fulfills this objective in two ways.[8] First, it redresses the imbalance between the State, a powerful, sophisticated, and determined adversary, and the accused, allowing the accused to rely upon the services of an attorney as a medium during critical stages of a criminal proceeding. *McNeil*, 501 U.S. at 177–78; *Maine v. Moulton*, 474 U.S. 159, 176 (1985). Second, it ensures fairness in criminal proceedings by recognizing "the obvious truth that the average defendant does not have the professional legal skill" to confront that expert adversary single-handedly during critical confrontations. *Moulton*, 474 U.S. at 168–69 (quoting *Johnson v. Zerbst*, 304 U.S. 458, 462–63 (1938)).

¶ 30. The right to counsel under the Sixth Amendment arises after adversary judicial proceedings have been initiated—in Wisconsin, by the filing of a criminal complaint or the issuance of an arrest warrant. *Kirby v. Illinois*, 406 U.S. 682, 688–89 (1972); *State v. Harris*, 199 Wis. 2d 227, 235 n.3, 544 N.W.2d 545 (1996) (citing *Jones v. State*, 63 Wis. 2d 97, 105, 216 N.W.2d 224 (1974)). The right extends to pretrial interrogations.[9] *Brewer v. Williams*, 430 U.S. 387, 401 (1977). The Sixth Amendment right thus protects a defendant during the early stages of a prosecution

---

[8] *See* Meredith B. Halama, Note, *Loss of a Fundamental Right: The Sixth Amendment as a Mere "Prophylactic Rule"*, 1998 U. Ill. L. Rev. 1207, 1209.

[9] For a discussion of the types of judicial proceedings to which the right attaches, see Woody Anglade, *Criminal Procedure: Defendants' Rights*, 29 Rutgers L. J. 1221, 1233–35 (1998).

357

"where the results might well settle the accused's fate and reduce the trial itself to a mere formality." *Moulton*, 474 U.S. at 170 (quoting *United States v. Wade*, 388 U.S. 218, 224 (1967)). Police and prosecutors are under an affirmative obligation not to circumvent or exploit the protections guaranteed by the right. *Id.* at 171, 176; *Jackson*, 475 U.S. at 634 n.8.

¶ 31. The Fifth Amendment has sometimes been identified as a source of the right to counsel, *McNeil*, 501 U.S. at 176–77, but the right embodied in the Fifth Amendment has a different theoretical underpinning from the right set forth in the Sixth Amendment.[10] The Sixth Amendment right to "Assistance of Counsel" is provided explicitly in the text of the Amendment and is designed to assist the "accused" with his or her "defence." The Fifth Amendment[11] right to counsel is not expressly provided. It is a right that exists by impli-

---

[10] *See generally* Daniel C. Nester, *Distinguishing Fifth and Sixth Amendment Rights to Counsel During Police Questioning*, 16 S. Ill. U. L. J. 101 (1991); James Tomkovicz, *Standards for Invocation and Waiver of Counsel in Confession Contexts*, 71 Iowa L. Rev. 975, 989–94 (1986); Craig R. Johnson, Note, *McNeil v. Wisconsin: Blurring a Bright Line on Custodial Interrogation*, 1992 Wis. L. Rev. 1643, 1652–53.

[11] The Fifth Amendment to the United States Constitution provides:

> No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury, except in cases arising in the land or naval forces, or in the Militia, when in actual service in time of War or public danger; nor shall any person be subject for the same offence to be twice put in jeopardy of life or limb; nor shall be compelled in any criminal case to be a witness against himself, nor be deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation.

cation, a prophylactic devised by courts to protect a person's right, in a criminal case, not to incriminate himself or herself involuntarily.[12] This Fifth Amendment right ensures that uncharged suspects may secure legal advice as a safeguard against relinquishment of the privilege against self-incrimination. *Miranda*, 384 U.S. at 463–66.

¶ 32. The Fifth Amendment right, articulated in *Miranda*, 384 U.S. at 444–45, applies to the custodial interrogation of *suspects*, not because *accused* persons need no protection against self-incrimination during police interrogation, but rather because persons who have been formally charged with a crime are protected by a robust right to counsel grounded in the Sixth Amendment. This Sixth Amendment right is offense-specific. *McNeil*, 501 U.S. at 175–77; *Coerper*, 199 Wis. 2d at 222. It is tied to the crime or crimes with which the accused is charged.

¶ 33. The Fifth Amendment right to counsel is broader than the Sixth Amendment right because it can be invoked to bar questioning about any suspected crime. *McNeil*, 501 U.S. at 178.[13] But the Fifth Amendment right also is narrower than the Sixth Amendment right because it focuses on a suspect's privilege against self-incrimination only while in custody. *Id.* By contrast, the accused's right to counsel under the Sixth

---

[12] *See* Halama, *Loss of a Fundamental Right* at 1214; David Edward Sipprell, Recent Case, *Criminal Law—Right to Counsel—Davis v. United States, 114 S. Ct. 2350 (1994)*, 73 N.C. L. Rev. 2013, 2013–14 (1994); Janet E. Ainsworth, *In a Different Register: The Pragmatics of Powerlessness in Police Interrogation*, 103 Yale L.J. 259, 295 (1993).

[13] *See also* Johnson, *McNeil v. Wisconsin* at 1658.

Amendment provides assistance at each and every critical stage of a criminal prosecution for the offense charged. *Moulton*, 474 U.S. at 170. The confusion surrounding these distinct "rights" results from a piecemeal blending of the two during custodial interrogation.

¶ 34. Historically, the Sixth Amendment right to counsel did not hinge on a formal request. In *Carnley v. Cochran*, 369 U.S. 506, 513 (1962), the Court declared that "it is settled that where the assistance of counsel is a constitutional requisite, the right to be furnished counsel does not depend on a request." *Carnley* was a pre-*Miranda* decision.

¶ 35. This understanding of the right was reaffirmed by Justice Rehnquist almost a quarter century later in his dissent in *Jackson*, when he said: "[U]nlike a defendant's 'right to counsel' under *Miranda*, which does not arise until affirmatively invoked by the defendant during custodial interrogation, a defendant's Sixth Amendment right to counsel does not depend at all on whether the defendant has requested counsel." 475 U.S. at 641.

¶ 36. Logically, a right that need not be requested or invoked is self-executing at every critical point where the right attaches.[14] Thus, the law has frowned upon police interrogation of a person formally charged with a crime about that crime without the presence of the accused's counsel. Once the " 'suspect' has become an 'accused'. . .the right to the assistance of counsel is of such importance that the police may no longer employ techniques for eliciting information from

---

[14] *Brewer v. Williams*, 430 U.S. 387, 404 (1977) ("the right to counsel does not depend upon a request by the defendant").

an uncounseled defendant that might have been entirely proper at an earlier stage of the investigation." *Id.* at 632.

¶ 37. Traditionally, Sixth Amendment jurisprudence has recognized that an accused person can waive the right to counsel.[15] The waiver principle is readily understandable at a trial or hearing in which a judge or neutral magistrate is able to ascertain whether the waiver is knowing, intelligent, and voluntary.[16] But an accused person's waiver of the right to counsel in the context of a police interrogation is more problematic, especially when the accused has an attorney.

¶ 38. The *Miranda* right to counsel was designed to protect suspects during custodial interrogation. In *Edwards v. Arizona*, 451 U.S. 477 (1981), the Court, concerned about the need for additional safeguards for "suspects" in custody, reinforced *Miranda* by holding that once an "accused" asserts the Fifth Amendment right to counsel, police interrogation of the "accused" must cease, and the "accused" may not be approached for further interrogation until counsel has been made available. *Edwards*, 451 U.S. at 484–85; *McNeil*, 501 U.S. at 176–77.

¶ 39. The *Edwards* decision spawned conceptual confusion. The Court repeatedly referred to Edwards as "the accused" because he had, in fact, been charged in a criminal complaint with several crimes, including first-degree murder. After Edwards asked for an attorney ("I want an attorney before making a deal"), he was told "he had" to talk with detectives. He did talk and

---

[15] *Brewer*, 430 U.S. at 401–06; *Id.* at 410 (Powell, J., concurring); *Id.* at 417 (Burger, C.J., dissenting); *Brookhart v. Janis*, 384 U.S. 1, 4 (1966).

[16] *See* Wis JI—Criminal SM—30 (Waiver and Forfeiture of Counsel) (1998).

ultimately incriminated himself after receiving *Miranda* warnings.

¶ 40. The Court ducked the question of whether Edwards's Sixth Amendment right to counsel had attached and been violated. It instead decided the case on Fifth and Fourteenth Amendment grounds, holding that the State had violated Edwards's rights by questioning him after he had asked for an attorney. The Court selected a compelling case to reinforce *Miranda*, as all members of the Court voted to suppress the incriminating statements, but it blurred the distinctions between the different "rights" to counsel. Justice Powell concurred in the result, stating bluntly: "I do not join the Court's opinion because I am not sure what it means." *Edwards*, 451 U.S. at 488.

¶ 41. After *Edwards*, the Fifth Amendment right to counsel for *suspects* during custodial interrogation appeared to be superior to the Sixth Amendment right to counsel for *accused* persons because accused persons still could waive their Sixth Amendment right but suspects, after personally invoking their right, could not.

¶ 42. The Court wrestled with this anomaly in *Jackson*, directly applying the *Edwards* rule barring interrogation to the Sixth Amendment right to counsel. *Jackson* was a consolidation of two cases. In one, a man was formally charged with murder. At his arraignment, he requested that counsel be obtained for him. A notice of appointment was promptly mailed to a law firm, but before the firm received it, the accused was interviewed again and confessed to officers. 475 U.S. at 627. In the other case, the defendant made incriminating statements about a murder while he was in custody for other offenses. He was charged with the murder and arraigned, and at the arraignment he asked for counsel. Before he had had a chance to meet with an

attorney, the man made additional incriminating statements in a police-initiated interview. *Id.* at 628. Both accused defendants received *Miranda* warnings before answering questions. Nonetheless, the Court voted to suppress their incriminating statements by extending *Edwards* to Sixth Amendment situations in which accused defendants have asserted the right to counsel. *Id.* at 636. Justice Rehnquist's dissent attacked the majority for creating a rule that required the *assertion* of the Sixth Amendment right to counsel, *id.* at 641, and for imposing Fifth Amendment doctrine on a Sixth Amendment right. *Id.* at 639–40.

¶ 43. Two years later, the Court confronted the fallout from its decision in *Patterson v. Illinois*, 487 U.S. 285 (1988). Patterson had been arrested on charges of battery and mob action. *Id.* at 287. After receiving *Miranda* warnings, he answered questions about the charges but denied knowledge of a gang slaying that had occurred the same day. *Id.* at 287–88. Witnesses accused Patterson of involvement in the slaying, however, and police held him in custody. *Id.* Two days later he was indicted for the murder. *Id.* at 288. When an officer informed Patterson of the indictment, Patterson asked which of his fellow gang members had been charged. Upon learning that the charges had omitted one particular gang member, Patterson asked: "[W]hy wasn't he indicted, he did everything." Patterson also began to explain that there was a witness who would support his account of the crime. *Id.*

¶ 44. At this point, the officer stopped Patterson from talking and did not proceed to question him until Patterson had received *Miranda* warnings and waived his rights. *Id.* Patterson later attempted to suppress his incriminating statements, alleging that they were

taken in violation of his Sixth Amendment right to counsel. Because the right to counsel had attached, he argued, police were barred from questioning him about the homicide. *Id.* at 289.

¶ 45. The principal issue in *Patterson* was whether a defendant whose Sixth Amendment right to counsel had attached could waive the right to counsel after receiving *Miranda* warnings. The Court concluded that a defendant could make a knowing and intelligent decision to face officers alone during questioning. 487 U.S. at 291. The Court reasoned that "whatever warnings suffice for *Miranda*'s purposes will also be sufficient in the context of postindictment questioning." *Id.* at 298.

¶ 46. In upholding Patterson's conviction, the Court suggested that the Sixth Amendment right to counsel was not qualitatively superior to the Fifth Amendment right, at least during custodial interrogation. *Id.* at 291, 297. More important here, the Court implied that although the Sixth Amendment right to counsel attaches at the time a charge is made—in Patterson's case, at indictment—a defendant still has to "exercise" the right affirmatively by expressing a desire for the assistance of counsel. *Id.* at 290–91. This ruling appeared to make two steps necessary to give the Sixth Amendment right to counsel effect during police interrogation: (1) the right must attach by way of adversarial judicial proceedings; and (2) the accused must request, invoke, or assert the right to counsel.

¶ 47. Despite this apparent clarification of the Sixth Amendment right to counsel, the *Patterson* Court, by way of a footnote, struck a note of caution when it indicated that its analysis would not apply to represented defendants:

We note as a matter of some significance that petitioner had not retained, or accepted by appointment, a lawyer to represent him at the time he was questioned by authorities. Once an accused has a lawyer, a distinct set of constitutional safeguards aimed at preserving the sanctity of the attorney-client relationship takes effect. . . . Indeed, the analysis changes markedly once an accused even requests the assistance of counsel.

*Id.* at 290 n.3. This potent observation left some commentators wondering whether the Sixth Amendment could still attach passively with the initiation of adversarial criminal proceedings.[17] After *Patterson,* some courts explicitly declined to extend *Patterson* to those cases in which a lawyer already represented the accused, finding that the right continued to self-execute.[18] Other courts acknowledged or implemented the

[17] *See* Colin E. Fritz, Comment, *Patterson v. Illinois: Applying Miranda Waivers to the Sixth Amendment Right to Counsel,* 74 Iowa L. Rev. 1261, 1262, 1272 (1989) ("the Court's decision in *Patterson* breaks from established constitutional precedent by denying automatic application of counsel for postindictment interrogations"); Halama, *Loss of a Fundamental Right* at 1226 ("[i]n light of the purpose of the Sixth Amendment, a request for counsel should be irrelevant").

[18] The Arkansas Supreme Court, for instance, declined to apply *Patterson* to a case in which a lawyer had been appointed for a defendant and the police, by imputation, had knowledge of that representation. *Bradford v. State,* 927 S.W.2d 329, 335 (Ark. 1996). The court held that "the Sixth Amendment right to counsel had clearly attached" even though the defendant "never formally requested counsel" because the "defendant enjoyed the right to rely on counsel as a medium between himself and the state." *Id.* (citing *Maine v. Moulton,* 474 U.S. 159 (1985)).

Similarly, the Florida Supreme Court observed that the "*Patterson* decision. . .[was] not critical to the analysis" when a

*Patterson* two-step approach, concluding that the accused must assert the right to counsel.[19]

defendant already was represented by counsel because by then, the "Sixth Amendment right had attached and been sufficiently invoked." *Rolling v. State*, 695 So. 2d 278, 290 n.8 (Fla. 1997). In *Smith v. State*, 699 So. 2d 629, 638–39 (Fla. 1997), by contrast, the Florida Supreme Court held that the appointment of a public defender to represent a defendant did not activate the Sixth Amendment because the defendant was unaware of and had not accepted the appointment of counsel. The court reasoned that unknown circumstances cannot affect a defendant's ability to comprehend and knowingly relinquish a constitutional right. *Id.* at 639 (citing *Moran v. Burbine*, 475 U.S. 412, 422 (1986)).

[19] *See e.g., State v. Harris*, 199 Wis. 2d 227, 235 n.3, 544 N.W.2d 545 (1996) ("[t]he Sixth Amendment right to counsel attaches upon formal commencement of prosecution. . . . Once asserted, the Sixth Amendment right to counsel bars further uncounseled interrogation"); *State v. Hornung*, 229 Wis. 2d 469, 476, 600 N.W.2d 264 (Ct. App. 1999) ("[h]owever, once the Sixth Amendment right to counsel has attached, a criminal defendant must seek to exercise this right"); *Wilcher v. State*, 697 So. 2d 1087, 1096–97 (Miss. 1997) (the "interrogation did not violate the [Sixth Amendment] because [the defendant] did not assert a right to counsel and thereby trigger its protection"); *State v. Sanchez*, 609 A.2d 400, 402 (N.J. 1992) ("now [the Sixth Amendment] apparently requires defendants to request counsel"); *State v. Royer*, 794 P.2d 1325, 1326 (Wash. Ct. App. 1990) ("the accused must assert or exercise that right before the police are prohibited by the Sixth Amendment from thereafter initiating custodial questioning"); *Holloway v. State*, 780 S.W.2d 787, 790 (Tex. Crim. Ct. App. 1989) ("[i]nvocation of counsel is therefore essential to bar further police contact"); *State v. Robey*, 371 S.E.2d 711, 713 (N.C. Ct. App. 1988) ("[o]nce [the defendant] requested counsel, she could not be interrogated by police"); *Chewning v. Rogerson*, 29 F.3d 418, 420 (8th Cir. 1994) ("[t]he right is not self-executing but must be invoked by the person claiming it").

¶ 48. Three years later, in *McNeil*, 501 U.S. 171, the Supreme Court quietly backed away from *Patterson*. It formulated a new statement of constitutional principles, building on *Jackson* but making no mention of *Patterson*. The Court consistently employed language that implied that an accused must "invoke" the Sixth Amendment right to counsel once the right attached,[20] but it acknowledged that "once this right to counsel has attached and has been invoked, any subsequent waiver during a police-initiated custodial interview is ineffective." *Id.* at 175. The Court's repeated references to a defendant's "invocation" of the Sixth Amendment right to counsel appear to crystalize the Court's view that a charged defendant in custody who does not have counsel must invoke, assert, or exercise the right to counsel to prevent interrogation.

¶ 49. We do not, however, read *McNeil* to require an accused defendant *who has an attorney for the crime charged* to show the same diligence as a defendant without an attorney. We see nothing in *McNeil* that forces such a defendant to *reassert* the Sixth Amendment right to counsel to quash police-initiated questioning about the crime charged. *McNeil* does not repudiate the unambiguous declaration that "[o]nce an accused has a lawyer, a distinct set of constitutional safeguards aimed at preserving the sanctity of the attorney-client relationship takes affect." *Patterson*, 487 U.S. at 290 n.3.

¶ 50. The *McNeil* court set out the rationale for this position:

> The State in *Jackson* [argued] that assertion of the Sixth Amendment right to counsel did not realistically constitute the *expression* (as *Edwards*

---

[20] *McNeil v. Wisconsin*, 501 U.S. 171, 175–79 (1991).

required) of a wish to have counsel present during custodial interrogation. . . .Our response to that contention was not that it *did* constitute such an expression, but that it *did not have to*, since the relevant question was not whether the *Miranda* "Fifth Amendment" right had been asserted, but whether the Sixth Amendment right to counsel had been *waived*. We said that since our "settled approach to questions of waiver requires us to give a broad, rather than a narrow, interpretation to a defendant's request for counsel. . .we *presume* that the defendant requests the lawyer's services at every critical stage of the prosecution." (Emphasis added.)

501 U.S. at 179. This presumption means that an accused who has retained counsel for the crime charged need not make a "real request" as required by the Fifth Amendment. *See id.*

¶ 51. Inevitably, there is an additional considera-tion. Although the State may not knowingly exploit the opportunity to confront the accused without the accused's counsel being present, *Moulton*, 474 U.S. at 176, this prohibition assumes knowledge by the authorities. Whether an accused person has counsel at the time some incriminating statement is made is an historical fact. It may not, however, be a fact known to authorities. Hence, unless the authorities know that the accused person has an attorney, either the accused defendant or the defendant's counsel should advise the authorities of the existence of counsel on the charge. The authorities must not avoid discovery of this infor-mation. Once a person has been charged, the police should anticipate the accused's effort to invoke the right to counsel or to advise them of representation by

counsel and should evaluate the accused's words and actions in that light.

¶ 52. In our view, the upshot of *McNeil* and its predecessors is that a distinction remains between the Sixth Amendment right to counsel and the right to counsel based on the Fifth Amendment. The Sixth Amendment right to counsel does not attach until the initiation of criminal charges. It then attaches for those specific charges. The right must be "invoked" by the accused to terminate police questioning before an attorney has been retained or appointed for those specific charges, provided the accused has been fully alerted to the right to have an attorney and the right not to answer questions. This normally would entail *Miranda* warnings.

¶ 53. After an attorney represents the defendant on particular charges, the accused may not be questioned about the crimes charged in the absence of an attorney. The authorities must assume that the accused does not intend to waive the constitutionally guaranteed right to the assistance of counsel.

¶ 54. The Sixth Amendment right to counsel is not violated when "by luck or happenstance—the State obtains incriminating statements from the accused after the right to counsel has attached." *Moulton*, 474 U.S. at 176. The defendant's unguarded outburst in *Patterson* appears to fall within this category. 487 U.S. at 288. Moreover, an accused person may initiate contact with authorities without consulting his or her attorney. *Edwards*, 451 U.S. at 485. Chief Justice Burger noted in *Jackson* that behavioral and theological specialists have long recognized "a natural human urge

of people to confess wrongdoing." 475 U.S. at 637. Incriminating statements made by a defendant after the defendant has contacted authorities are not per se inadmissible; but after an attorney has been retained or appointed, an accused's unsolicited contact with the police must be viewed with skepticism and will require authorities to show that incriminating statements were in fact voluntarily given. *State v. Agnello*, 226 Wis. 2d 164, 180–82, 593 N.W.2d 427 (1999). The authorities themselves may not initiate contact for questioning about the charges.

¶ 55. A person who formally has been charged with crimes may be treated as a "suspect" in the investigation of other uncharged crimes, *McNeil*, 501 U.S. at 175–76, but the investigation of these other uncharged crimes may not serve as a pretext to interview the accused about the crimes charged when the accused has an attorney.

¶ 56. We now apply the law to this case. The State does not dispute that Dagnall's right to counsel attached on October 14, the date on which Dane County authorities issued the criminal complaint and the date he was arrested in Florida and held in custody. Rather, the State contends that Dagnall did not invoke the right to counsel because his remark, "My lawyer told me that I shouldn't talk to you guys," did not constitute an unambiguous, unequivocal, and personal invocation of the Sixth Amendment right to counsel.

¶ 57. The State's argument would be relevant if Attorney Connors did not already represent Dagnall. Before an accused has counsel, the accused must invoke the right to counsel. But here, Dagnall had counsel. Attorney Connors represented Dagnall for the crime with which he was charged. He communicated

with Dagnall and may have spoken with him directly about the charge. He then informed the Dane County Sheriff's Department that he represented Dagnall and instructed the department not to question Dagnall about the homicide.

¶ 58. The law enforcement officers knew that Dagnall was represented by counsel but they proceeded to Florida, not only to accompany Dagnall back to Wisconsin, but also for the avowed purpose of obtaining a statement from him. Given the information they possessed about Dagnall's part in the homicide, the officers admittedly intended to bolster the prosecution against Dagnall by inducing him to "talk about the case." They accomplished this objective by convincing Dagnall that they wanted to hear his side of the story. Dagnall realized he had an attorney.[21] According to Hughes's own testimony, Dagnall gave the officers the impression that he did not want to talk with them. Dagnall stated: "My lawyer told me that I shouldn't talk to you guys." Even as he began to talk, he expressed an inarticulate concern about self-incrimination, thereby revealing that he was indeed not equipped to navigate the legal system alone.

¶ 59. To permit police questioning under these circumstances would authorize police subversion of the attorney-client relationship. Under these facts, we

---

[21] The record contains a document indicating that Dagnall appeared personally before Lee County Judge John Dommerich on October 15, 1997, to be advised of his rights. Dagnall waived extradition. This appearance probably occurred before Dagnall was questioned because the questioning did not begin until 4:20 p.m. and lasted more than an hour. The record does not include a transcript of Dagnall's initial appearance. A transcript might have indicated Dagnall's exact words about his relationship with Attorney Connors.

need not examine whether Dagnall "invoked" his Sixth Amendment right to counsel. He did not have to invoke his right because he already had counsel. To require an accused person to assert the right to counsel after the accused has counsel would invite the government to embark on a persistent campaign of overtures and blandishments to induce the accused into giving up his rights. This would be inconsistent with both the letter and the spirit of our law.

¶ 60. Even if Sixth Amendment doctrine now requires some invocation of the right to counsel before an accused retains an attorney, we think the formality of either appointing counsel or retaining counsel serves to invoke the right. For this case, we need not decide whether the test for invoking the Sixth Amendment right to counsel is identical to the Fifth Amendment test in situations where an unrepresented accused must invoke the right.[22]

---

[22] In *Edwards v. Arizona*, 451 U.S. 477, 484 (1981), the Supreme Court held that an invocation of the right to counsel under the Fifth Amendment must constitute an expression of a "desire to deal with the police only through counsel." The Court did not answer the question whether ambiguous or equivocal requests for counsel satisfy this threshold.

Subsequently, in *Davis v. United States*, 512 U.S. 452, 459 (1994), the Court held that: "Although a suspect need not 'speak with the discrimination of an Oxford don,' he must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney." The *Davis* Court found that the defendant's remark, "Maybe I should talk to a lawyer," was not an unequivocal request for counsel. The *Davis* suspect made the "[m]aybe I should talk to a lawyer" remark *before* authorities filed any charges; therefore, the Sixth Amendment right to counsel had not yet attached. *Id.* at

¶ 61. We find that, under the facts of this case, we need not assign the stringent standard of unambiguous, unequivocal, and personal invocation to the Sixth Amendment right to counsel because the Sixth Amendment does not address the defendant's desire to deal with the police "only in the presence of counsel."

¶ 62. Dagnall did not have to "invoke" his Sixth Amendment right to counsel because he was formally charged with a crime, he was in custody for that crime, he had an attorney and had communicated with that attorney, the attorney had admonished the authorities not to question Dagnall about the crime, and Dagnall had alerted authorities to the attorney-client relationship when he made his "my lawyer" remark. There is no dispute that the police knew Dagnall was represented by counsel.

¶ 63. Dagnall listened to the detectives, received *Miranda* warnings, and made "incriminating" statements. He did so three times. The State contends that Dagnall thus validly relinquished his right to counsel by speaking to the officers.

¶ 64. Like the court of appeals, we conclude that this argument is without merit: "Once a criminal defendant invokes his [or her] Sixth Amendment right to counsel, a subsequent waiver of that right—even if voluntary, knowing, and intelligent under traditional standards—is presumed invalid if secured pursuant to police-initiated interrogation." *Dagnall*, 228 Wis. 2d at 506 n.11 (citing *Harvey*, 494 U.S. at 345; *Jackson*, 475 U.S. at 625); *see also Harris*, 199 Wis. 2d at 251;

---

456–57. Nor was there any indication in *Davis* that the suspect had retained an attorney.

*McNeil*, 501 U.S. at 175; *Brewer*, 430 U.S. at 399–404; *Massiah v. United States*, 377 U.S. 201, 205–06 (1964).

¶ 65. In *Patterson*, 487 U.S. at 298, the Supreme Court held that a waiver of *Miranda* rights adequately satisfies the requisites for a valid waiver under either the Fifth or Sixth Amendments. Nonetheless, once the accused has invoked the Sixth Amendment right to counsel or once the accused has counsel, officers are "completely barred from approaching the accused" for a waiver "unless [the defendant] called for them." *Id.* at 291. Unlike Dagnall, the *Patterson* defendant was not represented by counsel. *Id.* at 290–91, 298–99. The *Patterson* Court indicated that its extension of the Fifth Amendment's waiver requirements to the Sixth Amendment did not apply to represented defendants. *Id.* at 290 n.3, 296 n.9. Other courts have taken note of this caution, declining to extend the *Patterson* analysis to represented defendants.[23]

¶ 66. Similarly, other courts sometimes allude to the sanctity of the attorney-client relationship as a barrier against questioning represented defendants

---

[23] *See Bradford v. State*, 927 S.W.2d 329, 335 (Ark. 1996) (holding that a *Miranda*-based waiver did not apply to a represented defendant because he "enjoyed the right to rely on counsel as a medium between himself and the state"); *Holloway v. State*, 780 S.W.2d 787 (Tex. Crim. Ct. App. 1989) (defendant's waiver of the Sixth Amendment right to counsel following a reading of *Miranda* warning was invalid because "Supreme Court's warning" in *Patterson* about the attorney-client relationship buttressed the Sixth Amendment protection); *United States v. Lopez*, 4 F.3d 1455, 1461 (9th Cir. 1993) ("the Sixth Amendment guarantee would be rendered fustian if one of its 'critical components,' a lawyer-client 'relationship characterized by trust and confidence,' could be circumvented by the prosecutor under the guise of pursuing the criminal investigation"); *State v. Piorkowski*, 700 A.2d 1146, 1153 (Conn. 1997).

without explicitly distinguishing the *Patterson* decision. In *State v. Lefthand*, 488 N.W.2d 799, 801–02 (Minn. 1992), for example, the Minnesota Supreme Court chastised the state for its cavalier disregard of the attorney-client relationship and held that "in-custody interrogation of a formally accused person who is represented by counsel should not proceed prior to notification of counsel or the presence of counsel." In Texas, the Court of Criminal Appeals held that once an attorney-client relationship arises in the Sixth Amendment context, police may conduct questioning only after notifying defense counsel. *Upton v. State*, 853 S.W.2d 548, 557 (Tex. Crim. App. 1993) (citing *Patterson*, 487 U.S. at 289 n.3).[24]

## CONCLUSION

¶ 67. We hold that the Sixth Amendment right to counsel protected Dagnall from police interrogation about the homicide once Dagnall was formally charged and once an attorney represented him on that charge. Because the detectives went to Florida knowing that counsel had been retained on the charge and because Attorney Connors had notified authorities that he represented Dagnall and did not want Dagnall questioned about the homicide, the detectives had no authority to question Dagnall about that crime. When they did so and obtained incriminating statements, they violated the constitutional safeguards to which Dagnall was entitled under the Sixth Amendment, and the statements should have been suppressed at trial. We therefore affirm the decision of the court of appeals, which remanded this case to the circuit court for fur-

[24] *See generally* Halama, *Loss of a Fundamental Right* at 1222–23, 1231–33.

ther proceedings with directions to grant Dagnall's motion to suppress the incriminating statements.

*By the Court.*—The decision of the court of appeals is affirmed.

¶ 68. N. PATRICK CROOKS, JUSTICE *(dissenting).* I dissent. The majority holds "that the Sixth Amendment right to counsel protected Dagnall from police interrogation about the homicide once Dagnall was formally charged and once an attorney represented him on that charge." Majority op. at ¶ 67.

¶ 69. Such a bright-line rule means that law enforcement officials may not even question a person such as Dagnall once charges are filed and the person has an attorney. According to the majority, it makes no difference that such an individual is given *Miranda* warnings, waives his or her Fifth and Sixth Amendment rights, and agrees to talk to police officers about the crime charged.

¶ 70. The majority holds that such a waiver is of no consequence and that incriminating statements resulting from such questioning must be suppressed. Majority op. at ¶ 4. The result is that, in this case, Dagnall's statements detailing his involvement, with co-defendant Christopher E. Murray, in beating a man to death with baseball bats will not be allowed in evidence. His conviction of first degree intentional homicide by use of a dangerous weapon, party to a crime, will be set aside.

¶ 71. The majority's holding is contrary to the position taken by the United States Supreme Court and is contrary to Wisconsin legal precedent as well.

¶ 72. I would reverse the decision of the court of appeals and allow Dagnall's conviction for the first-

degree intentional homicide of the victim, Norman Gross, to stand.

¶ 73. The United States Supreme Court has identified the Fifth and Sixth Amendments as two sources of a defendant's right to counsel. *McNeil v. Wisconsin*, 501 U.S. 171, 175–77 (1991); *Michigan v. Jackson*, 475 U.S. 625, 629 (1986). The Fifth Amendment provides protection against self-incrimination, and because of that, the right to counsel during a custodial interrogation. *Miranda v. Arizona*, 384 U.S. 436, 467 (1966). The Fifth Amendment does not expressly provide the protection of counsel; it is the protection against self-incrimination that allows a suspect the right to stop an interrogation until the assistance of counsel can be procured. *Michigan v. Tucker*, 417 U.S. 433, 447–49 (1974); *Miranda*, 384 U.S. at 467–70. Once the Fifth Amendment right has been invoked, a suspect may not be questioned further unless that suspect reinitiates such questioning. *Miranda*, 384 U.S. at 473–74.

¶ 74. In most significant respects, the Fifth and Sixth Amendments have been accorded similar treatment in regard to the right to counsel. In *Jackson*, 475 U.S. at 636, the Supreme Court extended the Fifth Amendment ruling in *Edwards v. Arizona*, 451 U.S. 477, 484–85 (1981), to apply to the Sixth Amendment. The Court found that the Sixth Amendment right to counsel should be accorded "at least as much protection as the Fifth Amendment right to counsel at any custodial interrogation." *Jackson*, 475 U.S. at 632. Therefore, as in a Fifth Amendment context, the Sixth Amendment guarantees that questioning must immediately cease after a suspect has asserted his or her right to counsel. *Id.* at 626; *Miranda*, 384 U.S. at 474.

¶ 75. The Sixth Amendment right provides charged suspects the right to counsel at all critical stages of the proceedings against them. *Massiah v. United States*, 377 U.S. 201, 205–07 (1964). This right to counsel attaches automatically "at the initiation of adversary judicial criminal proceedings. . . ." *United States v. Gouveia*, 467 U.S. 180, 189 (1984). *See also Kirby v. Illinois*, 406 U.S. 682, 689 (1972) (plurality opinion). In *Patterson v. Illinois*, the United States Supreme Court held that the Sixth Amendment right to counsel comes into effect with formal charges, but that the right must be affirmatively invoked by the defendant. 487 U.S. 285, 290–91 (1988).

¶ 76. The *Patterson* decision also made it clear that while different policies are involved in the Fifth Amendment and Sixth Amendment right to counsel, one right is not superior to the other, and it is not more difficult to waive the Sixth Amendment right than the Fifth Amendment right. *Id.* at 297–98. Dagnall was required to invoke the right personally. *Id.* at 290–91. Dagnall offers two facts, a letter and a statement, to support his claim that he had invoked his Sixth Amendment right and therefore, he argues, his proffered incriminating testimony in connection with the intentional homicide should be suppressed.

¶ 77. The letter from Dagnall's attorney, a third party, was insufficient to invoke Dagnall's Sixth Amendment rights. Dagnall had neither signed the letter, nor retained the attorney himself. Because a defendant must *personally* invoke his or her rights to be afforded Sixth Amendment protection, Dagnall's argument concerning this letter fails. *Id.*

¶ 78. Also, the statement made by Dagnall to the officers that "[m]y lawyer told me that I shouldn't talk to you guys" fails to establish a personal invocation of

his Sixth Amendment right. Majority op. at ¶ 2. This statement was merely a reiteration of the words of Attorney Connors and, as such, did not serve to invoke Dagnall's rights. Further, Dagnall's "my lawyer" statement made by him to the officers was ambiguous. It did not indicate whether Dagnall was either choosing to follow Connors' advice, or if he was reiterating a statement that he remembered his attorney making just hours before.

¶ 79. The central issue in this case is whether, under the totality of circumstances, the letter from Attorney Connors *combined* with the "my lawyer" statement made by Dagnall, constituted a clear invocation to the officers of the defendant's Sixth Amendment right to counsel. If so, the incriminating statements gained through officer questioning, which was initiated for the purpose of clarifying the defendant's ambiguous statement, should be suppressed. If not, then the suppression motion was properly denied by Dane County Circuit Court Judge Patrick J. Fiedler.

¶ 80. A matter involving a similar statement, where clarification by officers was not only allowed but appears to be encouraged, can be found in *State v. Long*, 190 Wis. 2d 386, 526 N.W.2d 826 (Ct. App. 1994). In *Long*, the defendant stated before the interrogation began that "[m]y attorney told me I shouldn't talk unless he is here." *Id.* at 391. The court of appeals held that the defendant's statement was merely "an indication of what Long's attorney told him not to do." *Id.* at 397. The court further held that the officers were correct in their attempt to clarify whether Long was invoking his right to counsel because the defendant's statement "was not a clear assertion of his desire to have counsel present." *Id.* In *Long*, the court of appeals stated that "[a] reasonable police officer could have

understood only that Long *might* be invoking his right to counsel. His statement reflected indecision and uncertainty and was not an invocation of his right to consult with counsel. . . . " *Id.* The court held "that because Long's request for counsel was ambiguous, the police were under no obligation to cease the interrogation." *Id.* at 390. The desire to have counsel present "must be made 'sufficiently clearly [so] that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney. . . .' " *Id.* at 395 (quoting *Davis v. United States*, 512 U.S. 452, 459 (1994)).

¶ 81. It is well established that when a defendant's statement is ambiguous or equivocal as to whether he or she wishes to invoke the right to counsel, officers are not required to cease the questioning of the individual unless it is clear that the defendant wishes to have an attorney present. *Davis*, 512 U.S. at 459. In *Davis*, the United States Supreme Court held that the defendant's comment, "Maybe I should talk to a lawyer," was not an unambiguous, unequivocal request for counsel. *Id.* at 455. *See also State v. Walkowiak*, 183 Wis. 2d 478, 486, 515 N.W.2d 863 (1994) (finding the statement, "Do you think I need an attorney?" equivocal and ambiguous).

¶ 82. I believe such is the case here, where the "my lawyer" statement by Dagnall did not unambiguously or unequivocally indicate to the officers with sufficient clarity exactly what he wanted to do. In accordance with *Davis*, the officers read Dagnall his *Miranda* rights and assured him that they would honor the defendant's decision about whether or not to proceed with questioning. Thereafter, Dagnall said he would talk to them and he voluntarily offered a statement to the officers, which certainly supports the

conclusion that the "my lawyer" comment was not made with the intention to invoke his Sixth Amendment rights. During the interview no request was made for an attorney, nor did the officers make any threats or promises. Majority op. at ¶ 11. Dagnall's subsequent statements support the conclusion that his statement was indeed ambiguous, since the actions taken by Dagnall were contrary to those that the defendant now asserts he really intended. His actions demonstrated the very indecision and uncertainty alluded to in *Long*. There the court decision allowed the officers to continue questioning a suspect, in order to gain clarification of the intention as to whether or not he wished to invoke his rights.

¶ 83. The majority asserts that Dagnall's "my lawyer" statement, coupled with his stated concern about self-incrimination, shows that he was "not equipped to navigate the legal system alone." Majority op. at ¶ 58. On the contrary, his statement about not wanting to incriminate himself demonstrates that he was aware of his rights when he started talking to the officers.

¶ 84. The bright-line rule adopted by the majority prohibiting police interrogation where there has been an ambiguous or equivocal Sixth Amendment invocation, or no invocation at all by the accused, could be disastrous for law enforcement officials in Wisconsin. The majority's rule, which requires only formal charges and representation by an attorney and nothing more, flies in the face of the applicable legal precedent.

¶ 85. I conclude that Dagnall did not personally and unambiguously invoke his Sixth Amendment right to counsel and, therefore, his proffered incriminating statements to the officers were properly obtained and should not be suppressed. The totality of the circum-

stances leads me to this conclusion. The letter from Attorney Connors was from a third party, was not signed or joined in by Dagnall, and, therefore, it cannot be said that Dagnall had personally invoked his rights through that letter. The "my lawyer" statement made by Dagnall to the officers did not personally and unambiguously invoke Dagnall's Sixth Amendment right to counsel, because not only did the statement merely reiterate the advice given to Dagnall by his attorney, but it was also ambiguous and equivocal. Finally, the subsequent questioning by the sheriff's officers, for the purpose of clarifying the ambiguity of Dagnall's initial "my attorney" statement, was proper and praiseworthy as good police practice, in light of the precedent discussed in this dissent.

¶ 86. The holding of the majority that all that is needed to prohibit police officers from questioning an accused such as Dagnall is formal charges and representation by an attorney on the charge does not withstand scrutiny when United States Supreme Court and Wisconsin case law are applied here. The majority's holding that despite the giving of the *Miranda* warnings by the officers to Dagnall, and despite the knowing, voluntary, and intelligent waiver of his rights by him, that his incriminating statements must be suppressed is contrary to the Supreme Court's holding in *Patterson*. In that case, the Court stated:

> As a general matter, then, an accused who is admonished with the warnings prescribed by this Court in Miranda, 384 U.S., at 479, 86 S.Ct., at 1630, has been sufficiently apprised of the nature of his Sixth Amendment rights, and of the consequences of abandoning those rights, so that his waiver on this basis will be considered a knowing and intelligent one. We feel that our conclusion in a

recent Fifth Amendment case is equally apposite here: "Once it is determined that a suspect's decision not to rely on his rights was uncoerced, that he at all times knew he could stand mute and request a lawyer, and that he was aware of the State's intention to use his statements to secure a conviction, the analysis is complete and the waiver is valid as a matter of law."

*Patterson*, 487 U.S. at 296–97 (citing *Moran v. Burbine*, 475 U.S. at 422–23, 106 S.Ct. at 1142 (1986)). The majority opinion appears to be based on a foundation of footnotes, while ignoring the central holding of *Patterson*.

¶ 87. Accordingly, I would reverse the decision of the court of appeals, and thereby affirm the decision of the circuit court to deny the suppression motion. For all these reasons, I respectfully dissent.

¶ 88. I am authorized to state that Justice JON P. WILCOX joins this dissent.