STATE of Wisconsin, Plaintiff-Respondent,

v.

Scott Leason BADKER, Defendant-Appellant.†

Court of Appeals

*No. 99–2943–CR. Submitted on briefs June 23, 2000.—Decided December 7, 2000.*

## 2001 WI App 27

(Also reported in 623 N.W.2d 142.)

†Petition to review denied.

464

On behalf of the defendant-appellant, the cause was submitted on the briefs of *Timothy A. Provis* of Madison.

On behalf of the plaintiff-respondent, the cause was submitted on the brief of *James E. Doyle*, attorney

general, and *Marguerite M. Moeller*, assistant attorney general.

Before Roggensack and Deininger, JJ. and William Eich, Reserve Judge.

¶ 1. ROGGENSACK, J. Scott Leason Badker appeals his convictions for first-degree intentional homicide and hiding a corpse. He claims that the circuit court erred by refusing to suppress his confession because of violations of his Fifth and Sixth Amendment rights and by refusing to dismiss the charge of hiding a corpse due to insufficient evidence. Because investigators scrupulously honored Badker's right to remain silent and because the crimes of first-degree intentional homicide and bail jumping are not so closely related as to extend Badker's Sixth Amendment right to counsel from the bail jumping charge to the first-degree homicide charge, we conclude that his suppression motion was properly denied. In addition, we conclude there was sufficient evidence to prove that Badker hid his victim's corpse. Therefore, we affirm the judgment of the circuit court.

## BACKGROUND

¶ 2. On September 17, 1997, Scott Badker sexually assaulted his girlfriend, Susan Myszka, tied her up, put a noose around her neck, and told her that he was taking her to Ohio with him. Myszka managed to escape when Badker stopped for gas. He was charged in Marathon County with kidnapping, three counts of sexual assault, false imprisonment, and battery. On October 10, he was released on bail on the condition that he have no contact, including telephone contact, with Myszka.

¶ 3. Myszka wrote a letter to Badker asking him to explain why he had assaulted her, but she did not mail it. On October 25, Badker telephoned Myszka at her home to arrange a meeting. Myszka consented and met him at a gas station in Spencer. She brought the letter with her. Badker read it, then put it in an envelope addressed to his attorney and left it at a Marshfield grocery store with the understanding that the clerk would mail it. Badker and Myszka drove around in Badker's pickup throughout the evening. Eventually, they parked the truck outside a locked gate leading into the Necedah Wildlife Refuge, where, according to his confession which is the major focus of this appeal, Badker strangled Myszka to death and used a blanket to drag her body into a ditch. A fur trapper found her body early on October 26th.

¶ 4. After killing Myszka, Badker went home and burned the blanket, Myszka's purse, and some of her clothing. He then telephoned his lawyer to tell him that Myszka had been bothering him, and he mentioned Myszka's letter. The lawyer told Badker to bring the letter to his office the following day, so Badker returned to the grocery store, got the letter, and brought it to the lawyer's office on October 27. He did not tell the lawyer that he had killed Myszka. On October 30, a complaint was filed in Marathon County Circuit Court charging Badker with bail jumping based on his telephone call to Myszka on October 25. An arrest warrant was issued for the bail jumping at the same time.

¶ 5. Badker was arrested on the bail jumping charge in Eagan, Minnesota, early in the morning on October 31 by Minnesota and Wisconsin police officers. Special Agent Elizabeth Feagles of the Wisconsin Department of Criminal Investigation and Detective

Gary Jepsen of the Marshfield Police Department attempted to interview Badker when he arrived at the Eagan police station. Badker told them that he had an attorney representing him on the Marathon County charges, and Feagles and Jepsen told him that they did not intend to discuss those charges. Jepsen then began reading Badker his *Miranda*[1] rights, but Badker interrupted and said that his attorney had told him not to talk with police officers. Feagles and Jepsen immediately terminated the interview and turned him over to Eagan Detective Douglas Mattison for booking. During booking, Mattison said to Badker, "So you don't want to talk, huh?" Badker replied, according to Mattison, "I am not sure what I want to do." Mattison completed the booking process, then informed Feagles and Jepsen of Badker's comment. Badker was taken to an interview room, where Feagles and Jepsen asked him whether he would like to talk to them. Badker declined; Feagles and Jepsen left Badker alone in the room.

¶ 6. A few minutes later, Badker began groaning and rubbing his eyes. Another Eagan detective, Kevin McGrath, went in to check on him and asked whether he was alright. McGrath said Badker replied, "No, I think I am sick" and began pushing his left index finger against his forehead. McGrath again asked if he was alright, and he relayed that Badker replied, still pointing at his head, "I think I am sick right here. I couldn't help it. I just snapped." McGrath asked whether he wanted medical assistance, and McGrath said Badker replied, "I think I need some help." McGrath asked what type of help he wanted, and Badker said that he wanted to talk with the Wisconsin investigators. Feagles and Jepsen re-entered the interview room and

---

[1] *Miranda v. Arizona*, 384 U.S. 436 (1966).

read Badker his *Miranda* warnings. Badker told the Wisconsin investigators that he wanted to talk with them; then he confessed to murdering Myszka and dragging her body into the ditch.

¶ 7. Subsequently, Badker was charged with first-degree intentional homicide and hiding a corpse. Before trial, he moved to suppress his confession, and the circuit court denied the motion. Badker was tried before a jury, convicted on both counts, and sentenced to life in prison. He appeals.

## DISCUSSION

### Standard of Review.

¶ 8. Issues concerning a criminal defendant's right to counsel involve questions of historic fact applied to a constitutional standard. *State v. Dagnall*, 2000 WI 82, ¶ 26, 236 Wis. 2d 339, 354–55, 612 N.W.2d 680, 687. We will uphold a circuit court's findings of historic fact unless they are clearly erroneous. WISCONSIN STAT. § 805.17 (1997–98).[2] However, whether the circuit court's findings of fact satisfy a constitutional standard is a question of law that we review *de novo*. *Dagnall*, 2000 WI 82 at ¶ 27.

¶ 9. In reviewing the sufficiency of the evidence to support a criminal conviction, we do not substitute our judgment for that of the trier of fact unless the evidence, viewed in the light most favorable to the State and the conviction, is so lacking in probative value and force that no reasonable trier of fact could

---

[2] All references to the Wisconsin Statutes are to the 1997–98 version unless otherwise noted.

have found guilt beyond a reasonable doubt. *State v. Steenberg Homes, Inc.*, 223 Wis. 2d 511, 517, 589 N.W.2d 668, 671 (Ct. App. 1998), *review denied*, 225 Wis. 2d 489, 594 N.W.2d 384 (1999) (citation omitted).

## Fifth Amendment Right to Remain Silent.

¶ 10. Badker first argues that the circuit court should have suppressed his statements to the police because they failed to scrupulously honor his invocation of his right to remain silent before he confessed to Myszka's murder. He also claims that physical evidence obtained from his truck and from a burn barrel located at his residence should have been suppressed as the fruit of a Fifth Amendment violation. We disagree.

¶ 11. The Fifth Amendment to the United States Constitution provides, "No person . . . shall be compelled in any criminal case to be a witness against himself."[3] "The critical safeguard of the right to silence is the right to terminate questioning by invocation of the right to silence." *State v. Hartwig,* 123 Wis. 2d 278, 284, 366 N.W.2d 866, 869 (1985); *see also Michigan v. Mosley*, 423 U.S. 96, 103 (1975); *Miranda v. Arizona*, 384 U.S. 436, 474 (1966). An accused person may waive the right to remain silent if he or she does so knowingly, intelligently, and voluntarily and does so in an express statement. *Miranda*, 384 U.S. at 475–76, *citing Glasser v. United States*, 315 U.S. 60, 62 (1942).

---

[3] The Fifth Amendment privilege against self-incrimination is applied to the states by the Fourteenth Amendment. *Malloy v. Hogan*, 378 U.S. 1, 3 (1964).

¶ 12. However, the state may not badger an accused into waiving that right. "The state may again interrogate the accused after the right to silence has been invoked provided that right to silence is 'scrupulously honored.'" *Hartwig*, 123 Wis. 2d at 284, 366 N.W.2d at 869, *quoting Mosley*, 423 U.S. at 104. This protection exists to shield the accused from "repeated efforts to wear down his resistance and make him change his mind." *Mosley*, 423 U.S. at 105–06. *Mosley* outlines a five-factor framework to analyze whether interrogation was resumed without violating the defendant's right to remain silent: (1) whether the original interrogation was promptly terminated; (2) whether interrogation was resumed after a significant period of time; (3) whether the accused received *Miranda* warnings at the beginning of the subsequent interrogation; (4) whether a different officer resumed the questioning; and (5) whether the subsequent interrogation was limited to a different crime than the previous interrogation. *Mosley*, 423 U.S. at 105–06; *Hartwig*, 123 Wis. 2d at 284, 366 N.W.2d at 869. "The absence or presence, however, of the *Mosley* factors is not exclusively controlling and these factors do not establish a test which can be 'woodenly' applied." *Hartwig*, 123 Wis. 2d at 284–85, 366 N.W.2d at 870 (citation omitted).

¶ 13. Therefore, "law enforcement officers conducting a custodial interrogation must employ procedural safeguards sufficient to protect a defendant's . . . privilege against compelled self-incrimination." *State v. Armstrong*, 223 Wis. 2d 331, 351, 588 N.W.2d 606, 615 (1999), *modified* 225 Wis. 2d 121, 591 N.W.2d 604 (1999) (citations omitted). Deter-

mining whether an "interrogation" has taken place focuses on the perception of the accused, not the intent of the police officer.[4] *Id.* at 357, 588 N.W.2d at 617; *Rhode Island v. Innis,* 446 U.S. 291, 301 (1980). In *Innis,* the U.S. Supreme Court held:

> [T]he term "interrogation" under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the subject. ... A practice that the police should know is reasonably likely to evoke an incriminating response from a suspect thus amounts to interrogation. But, since the police surely cannot be held accountable for the unforeseeable results of their words or actions, the definition of interrogation can extend only to words or actions on the part of police officers that they should have known were reasonably likely to elicit an incriminating response.

446 U.S. at 300–01 (footnotes omitted). The Wisconsin Supreme Court has phrased this test as "whether the police officer's conduct or speech could reasonably have had the force of a question on the suspect." *State v. Cunningham,* 144 Wis. 2d 272, 278, 423 N.W.2d 862, 864 (1988).

¶ 14. We first conclude that Mattison's statement during the booking did not constitute interrogation. This statement, Badker argues, constituted interrogation because it was "words or actions on the part of police officers that they should have known

---

[4] It is not disputed that Badker was in custody during this period.

were reasonably likely to elicit an incriminating response." *Innis*, 446 U.S. at 302. At the suppression hearing, Mattison testified that he made the statement as "just conversation," and the circuit court found it was "passing of the time of day." Mattison's intent, of course, does not determine whether his statement was interrogation, but Badker did not perceive it as interrogation either. According to Mattison, Badker responded, "I am not sure what I want to do," showing that he viewed the question as an inquiry into whether he intended to talk with the Wisconsin agents, not as an attempt to elicit an incriminating response.

¶ 15. We also conclude that the truncated interview by the Wisconsin investigators that followed Badker's remark to Mattison does not constitute interrogation. Badker's statement to Mattison indicated that he might be willing to waive his right to remain silent. The Wisconsin agents spoke with Badker in response to this statement. Badker was again read the *Miranda* warnings, and he again said that his attorney had told him not to talk with police officers. The Wisconsin agents immediately ended the interview and left the room without asking Badker any questions reasonably likely to provoke an incriminating response. Their conduct reflects no effort to wear down Badker and change his mind with respect to his decision to remain silent.

¶ 16. Furthermore, McGrath's questions to Badker were not interrogation. Badker argues that an interrogation began when McGrath determined that Badker did not require medical assistance but continued to ask him questions. Again, we disagree. McGrath testified that he entered the room after Badker began

473

moaning and crying. His subjective intent in entering the room is irrelevant; instead, we focus on how Badker would have perceived McGrath's questions. McGrath asked no questions about Badker's guilt or innocence, and he never suggested that Badker should waive his right to remain silent. Instead, he repeatedly asked Badker whether he needed medical assistance, a question not reasonably likely to elicit an incriminating response. When Badker replied that he thought he needed some help, McGrath asked him what kind of help he wanted.[5] Given the circumstances, this is not a question reasonably likely to provoke an incriminating response; instead, it seems much more likely that it would have provoked a response such as "I'd like an aspirin" or "I'd like to see a doctor." It does not constitute an interrogation.

¶ 17. Therefore, we conclude that Badker was interrogated twice—once when he was brought into the Eagan police station and once after he expressed a

_____

[5] Badker argues that *State v. Price*, 111 Wis. 2d 366, 330 N.W.2d 779 (Ct. App. 1983), requires us to conclude that McGrath's statements constituted an interrogation. Price had invoked his right to an attorney but continued to converse with police officers. During the conversation, he asked what was likely to happen to him and whether he could obtain medical treatment for headaches. One police officer told him that he had been identified in a line-up; another added, "Roger, if you want help, this is the place to start." Price then confessed. We concluded that the officer's statement was reasonably likely to elicit an incriminating response and therefore constituted interrogation. Unlike the police officer's statement in *Price*, McGrath's question was not coupled with a statement indicating Badker's guilt. Furthermore, it was not an invitation to seek help from the police; instead, it was a question asked to determine whether Badker wanted medical assistance.

desire unprompted by police questioning to speak with the Wisconsin investigators. Before the second interrogation, he was given *Miranda* warnings and freely, knowingly, and voluntarily waived his right to remain silent. At no point did the police officers make repeated efforts to wear down his resistance or make him change his mind. Instead, they scrupulously observed his right to remain silent, withdrawing immediately whenever he invoked his right and refraining from approaching him again until he expressed a desire to waive that right.

**Sixth Amendment Right to Counsel.**

¶ 18. Next, Badker contends that the circuit court erred in refusing to suppress his confession because it was taken in violation of his Sixth Amendment right to counsel. Although he had not been charged with Myszka's murder when he confessed, he contends that his Sixth Amendment right to counsel had attached to the murder offense because he had invoked his right to counsel on the bail jumping charge, a closely related offense. We disagree that the bail jumping charge was closely related to Myszka's murder.

¶ 19. Under the Sixth Amendment to the United States Constitution, an accused person has the right to assistance of counsel in all criminal prosecutions.[6] A defendant who has been arrested but not charged, however, has no right to counsel under the Sixth Amendment. *State v. Lale*, 141 Wis. 2d 480, 485, 415

---

[6] The Sixth Amendment right to counsel is applied to the states through the Due Process Clause of the Fourteenth Amendment. *Gideon v. Wainwright*, 372 U.S. 335, 342 (1963).

N.W.2d 847, 849–50 (Ct. App. 1987). Instead, the Sixth Amendment right to counsel attaches once the state has begun adversary proceedings by filing a criminal complaint or issuing an arrest warrant. *McNeil v. Wisconsin*, 501 U.S. 171, 175 (1991); *Dagnall*, 2000 WI 82 at ¶ 30. If the state has begun adversary proceedings on one charge but not on a second unrelated charge, the Sixth Amendment right to counsel has not attached to the second charge. *Dagnall*, 2000 WI 82 at ¶ 32. Once the Sixth Amendment right to counsel has attached and the accused has either invoked it or obtained counsel, "any subsequent waiver during a police-initiated custodial interview is ineffective." *McNeil*, 501 U.S. at 175; *see also Dagnall*, 2000 WI 82 at ¶ 65.

¶ 20. However, a growing number of courts recognize an exception to the offense-specific rule when charges have been filed in a "closely related" case. *United States v. Covarrubias*, 179 F.3d 1219, 1224–25 (9th Cir. 1999); *United States v. Melgar*, 139 F.3d 1005, 1014–15 (4th Cir. 1998); *United States v. Arnold*, 106 F.3d 37, 42 (3d Cir. 1997); *United States v. Doherty*, 126 F.3d 769, 776 (6th Cir. 1997); *United States v. Cooper*, 949 F.2d 737, 743–44 (5th Cir. 1991); *Taylor v. State*, 726 So. 2d 841, 845 (Fla. Dist. Ct. App. 1999); *People v. Wahl*, 674 N.E.2d 454, 462 (Ill. App. Ct. 1996); *Whittlesey v. State*, 665 A.2d 223, 234–35 (Md. 1995); *Commonwealth v. Rainwater*, 681 N.E.2d 1218, 1223 n.5 (Mass. 1997); *State v. Tucker*, 645 A.2d 111, 121 (N.J. 1994); *In re Pack*, 616 A.2d 1006, 1010–11 (Pa. Super. Ct. 1992); *Upton v. State*, 853 S.W.2d 548, 555–56 (Tex. Crim. App. 1993).

¶ 21. The purpose of the exception "is to prevent the State from interrogating a defendant about a distinct course of criminal conduct—one capable of supporting a new charge—outside of the presence of

the defendant's attorney, when the fruits of a successful interrogation will be admissible as substantive proof of the charges upon which adversarial judicial criminal proceedings have commenced." *Wahl*, 674 N.E.2d at 462. However, the "closely related" exception is interpreted narrowly because "[t]he Sixth Amendment does not create a sanctuary for the commission of additional crimes during the pendency of an indictment." *United States v. Kidd*, 12 F.3d 30, 33 (4th Cir. 1993). "To fall within this exception, the offense being investigated must derive from the same factual predicate as the charged offense." *Id.* No single factor determines whether the offenses are closely related, *Covarrubias*, 179 F.3d at 1225, but the analysis considers the persons involved, the types of offenses, the locations of the crimes, and the time each was committed. *Kidd*, 12 F.3d at 33.

¶ 22. Assuming without deciding that Badker had invoked his right to counsel on the bail jumping charge, we nevertheless conclude that the bail jumping charge was not closely related to Myszka's murder. The factual predicate for the bail jumping charge was Badker's telephone call to Myszka at her Marshfield home at approximately 6:00 p.m. on October 25. This call violated the no-contact provision of Badker's bail agreement. By contrast, the factual predicate for the murder charge was Badker's strangling Myszka sometime before dawn on October 26 at the Necedah Wildlife Refuge. Both charges involved the same persons, but the similarity ends there. Each was a separate offense that would have to be proven separately. The offenses of first-degree intentional homicide and bail jumping contain no common ele-

ments.[7] The offenses are distinct in time; more than six hours passed between Badker's telephone call and Myszka's murder, during which time the two drove from Spencer to Rhinelander and back, making several stops along the way. Finally, the offenses are distinct in location. Badker called Myszka from Spencer, which is in Wood County. He killed her at the Necedah Wildlife Refuge, in Juneau County. More than thirty miles separate the two locations. Accordingly, we conclude that the two offenses are not closely related.

¶ 23. Because the two offenses are not closely related, we also conclude that Badker's Sixth Amendment right to counsel had not attached for the offense of first-degree intentional homicide when Badker confessed to Myszka's murder. Accordingly, the circuit court did not err in refusing to suppress Badker's confession.

## Sufficiency of the Evidence.

¶ 24. Badker contends that the evidence was insufficient to convict him of violating WIS. STAT. § 940.11(2), which provides, "Whoever hides . . . a corpse, with intent to conceal a crime or avoid apprehension, prosecution or conviction for a crime, is guilty of a Class D felony." Badker challenges the sufficiency of the evidence with respect to whether his actions constitute "hiding" a corpse.

---

[7] The elements of first-degree intentional homicide are that the defendant (1) caused death (2) with intent to kill (3) in the absence of mitigating circumstances. WISCONSIN STAT. § 940.01. The elements of felony bail jumping are that the defendant (1) was charged with a felony, (2) was released from custody on bond, and (3) intentionally failed to comply with the terms of the bond. WISCONSIN STAT. § 946.49(1)(b).

¶ 25. WISCONSIN STAT. § 940.11(2) does not define the word "hides," nor has any Wisconsin published appellate case; therefore, we look to the standard dictionary definition for guidance.[8] WEBSTER'S II NEW COLLEGE DICTIONARY 521 (1999) defines "hide" as "to put or keep out of sight."

¶ 26. In his statement to the Wisconsin investigators, Badker said he killed Myszka inside his truck and her body fell out when he opened the door and unbuckled her seatbelt. However, he did not leave her body where it landed. Instead, he rolled it onto a blanket, then pulled the blanket over to a ditch inside the Necedah Wildlife Refuge and dumped her corpse into the water. Photographs of the location entered into evidence at trial reveal that it is a wooded, secluded spot. A locked gate prevents cars from driving into it. Except for trappers, members of the public are not allowed past the gate until twenty-four hours before the opening of gun deer hunting season. Myszka's corpse was found inside the Necedah Wildlife Refuge in a ditch more than six feet deep. She was lying in ten inches of water and was located about thirteen feet beyond the gate and 1,100 feet from the centerline of a gravel road. The secluded nature of the spot where the corpse was discovered, as well as Badker's actions in dragging it to the ditch and rolling it down into the water, provided sufficient evidence from which the jury could have concluded beyond a reasonable doubt that he hid Myszka's corpse.

[8] When not specifically defined in the statutes, a non-technical term must be given its ordinary and accepted meaning, and that meaning may be ascertained from a recognized dictionary. *State v. Steenberg Homes, Inc.*, 223 Wis. 2d 511, 519 n.3, 589 N.W.2d 668, 672 n.3 (Ct. App. 1998).

## CONCLUSION

¶ 27. Because investigators scrupulously honored Badker's right to remain silent and because the crimes of first-degree intentional homicide and bail jumping are not so closely related as to extend Badker's Sixth Amendment right to counsel from the bail jumping to the first-degree homicide charge, we conclude that his suppression motion was properly denied. In addition, we conclude there was sufficient evidence to prove that Badker hid his victim's corpse. Therefore, we affirm the judgment of the circuit court.

*By the Court.*—Judgment affirmed.