COURT OF APPEALS
DECISION
DATED AND FILED

May 28, 2025

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No.     **2022AP2222-CR**

Cir. Ct. No.  2020CF1565

**STATE OF WISCONSIN**

IN COURT OF APPEALS
DISTRICT III

---

STATE OF WISCONSIN,

   PLAINTIFF-RESPONDENT,

 V.

ROGER A. MINCK,

   DEFENDANT-APPELLANT.

---

APPEAL from a judgment of the circuit court for Eau Claire County: JOHN F. MANYDEEDS, Judge. *Affirmed*.

Before Stark, P.J., Hruz, and Gill, JJ.

¶1    HRUZ, J.  Following a jury trial, Roger Minck was convicted of hiding a corpse, contrary to WIS. STAT. § 940.11(2) (2023-24).[1]   Minck now appeals, arguing, for two reasons, that the evidence presented at trial was insufficient to support his conviction.

¶2    First, Minck contends that the evidence was insufficient to show that he was the person who hid the victim's corpse.  For the reasons explained below, we conclude that the State presented sufficient circumstantial evidence from which a reasonable jury could find, beyond a reasonable doubt, that Minck hid the victim's corpse.

¶3    Second, Minck asserts that the evidence was insufficient to show that he hid the victim's corpse "with intent to conceal a crime," as required by WIS. STAT. § 940.11(2).  More specifically, Minck argues that the State was required—and failed—to prove that he hid the victim's corpse with intent to conceal the victim's homicide.

¶4    We conclude that the plain language of WIS. STAT. § 940.11(2) merely required the State to prove that Minck hid the victim's corpse with intent to

---

[1] All references to the Wisconsin Statutes are to the 2023-24 version.  The offense at issue in this case occurred in 2018.  However, WIS. STAT. § 940.11(2) has not been amended since that time.  Accordingly, for convenience, we refer to the current version of the Wisconsin Statutes.

In addition to the hiding a corpse charge, the jury also convicted Minck of two additional offenses: delivery of Schedule I or II narcotics and maintaining a drug trafficking place.  Minck does not challenge those convictions on appeal, and we therefore do not discuss them further.

We note that Minck's case was initially assigned to the Honorable John F. Manydeeds, who handled all pretrial matters. Judge Manydeeds was unable to preside over Minck's jury trial, however, and the Honorable Howard Cameron therefore presided over the trial. Judge Manydeeds ultimately returned to the case and presided over Minck's sentencing.

conceal *a* crime—not any specific crime, such as the victim's homicide. Here, the evidence was sufficient for the jury to find, beyond a reasonable doubt, that Minck hid the victim's corpse with intent to conceal Minck's illegal drug trafficking. Alternatively, the evidence was also sufficient to support a finding that Minck hid the victim's corpse with intent to conceal the victim's homicide. We therefore reject Minck's assertion that the evidence was insufficient to support his conviction for hiding a corpse, and we affirm his judgment of conviction.

## BACKGROUND

¶5      The State charged Minck with hiding the corpse of Thane,[2] who was missing for approximately one month before law enforcement discovered his body. At trial, one of the State's witnesses, Tyrone,[3] testified that Thane had a heroin addiction. According to Tyrone, on the afternoon of November 5, 2018, Thane told Tyrone that he was going to drive from his home in Gilmanton to acquire heroin from Minck, who lived in Eau Claire. After Thane left his home, Tyrone spoke to him on the phone at 5:14 p.m. Thereafter, Tyrone repeatedly called Thane's phone, but all of his calls went to voicemail. Thane never returned home on November 5.

¶6      The next day, November 6, 2018, a coworker reported Thane missing after Thane uncharacteristically failed to show up for his job as a rural letter carrier with the United States Postal Service. On November 7, police found

---

[2] Following the State's lead, we refer to the victim using the pseudonym "Thane" and to one of the witnesses in this case as "Tyrone." *See* WIS. STAT. RULE 809.86(4).

[3] Tyrone explained during his testimony that although Thane was not his biological father, Thane had been a father figure to him while Tyrone was growing up, and Tyrone considered Thane to be his father.

Thane's unoccupied vehicle near the Lake Altoona Dam, which is east of Eau Claire and approximately three to four minutes from Minck's residence. The amber light that was normally affixed to the roof of Thane's car for his employment was missing and was never recovered.

¶7    Detectives interviewed Minck at his home on November 13, 2018. During the interview, Minck claimed that Thane was supposed to come to Minck's residence between 4:00 and 6:00 p.m. on November 5 to give Minck a ride to a scrapyard so that Minck could buy a car from Thane's friend. According to Minck, however, Thane never arrived at Minck's residence. Minck told the detectives that after Thane failed to show up, he tried calling Thane, but the call "went to voicemail."

¶8    During the November 13, 2018 interview, Minck denied that he was planning to give someone 120 "pills" "for brokering the car deal," stating instead, "We were just gonna give him cash." The detectives also asked Minck about the drug habits of Daniel Schofield, a longtime friend of Thane's with whom Minck was familiar. Minck told the detectives that he believed Schofield would take "a couple pills here and there," but Minck denied ever "hook[ing] [Schofield] up with pills."

¶9    Minck agreed to let the detectives walk through his residence during the November 13, 2018 interview, but they did not find Thane there. At that time, Minck lived in one half of a duplex, and his brother Kenneth lived in the other half. The detectives did not walk through Kenneth's half of the duplex on November 13.

¶10    During the course of their investigation, law enforcement obtained Thane's cell phone records. The records showed that the cell phone towers that

4

Thane's phone used on November 5, 2018, were consistent with Thane driving from his home in Gilmanton to Eau Claire. The phone records also showed that Thane made his last outgoing phone calls on November 5 at 4:57 and 4:59 p.m., and both of those calls were to Minck. Thane also accepted a call from Minck at 4:58 p.m. The phone records further confirmed that Thane spoke with Tyrone at 5:14 p.m. and that, beginning at 5:31 p.m., all incoming calls to Thane's phone went to voicemail. In addition, the phone records showed that, contrary to what Minck told the detectives during the November 13 interview, Minck never tried to call Thane after 4:59 p.m. on November 5.

¶11    Law enforcement also obtained traffic camera footage from an intersection one and one-half blocks from Minck's residence. The footage showed Thane's vehicle driving through that intersection at 5:25 p.m. on November 5, 2018, traveling toward Minck's residence. The vehicle still had its distinctive amber light attached to its roof.

¶12    After obtaining this information, detectives interviewed Minck again on December 6, 2018. Minck continued to deny having seen Thane on November 5. He did, however, admit the practice of selling oxycodone pills from his home, which he called a "hustle."

¶13    At the end of the December 6, 2018 interview, the detectives told Minck that they would be searching both his home and Kenneth's home.[4] Kenneth had been in jail without work release privileges since November 2, 2018—three days before Thane went missing. Minck told the detectives that they

---

[4] At trial, an officer testified that Kenneth consented to a search of his residence.

5

did not need to search Kenneth's residence because "no one's been over there." Minck also denied having a key to Kenneth's residence. At trial, however, Kenneth testified that before going to jail, he threw his house keys onto the coffee table at Minck's residence, in front of Minck's girlfriend.

¶14   While searching Minck's home on December 6, 2018, law enforcement recovered a glass pipe with methamphetamine residue on it and several prescription bottles—some bearing Minck's name, some bearing his girlfriend's name, and some without names. The officers also observed two flat-screen televisions in Minck's home, one in the living room and one in Minck's daughter's bedroom.

¶15   Lacking keys to Kenneth's half of the duplex, law enforcement called a locksmith to open the door, but that effort was unsuccessful. A detective then went around to the north side of Kenneth's residence, where he removed an exterior window screen and then slid open an unlocked window. The detective took a cell phone picture through the open window, which showed a corpse on the floor that was partially covered by a green tarp. The corpse's face was exposed, and law enforcement positively identified the body as Thane.

¶16   Officers eventually gained entry to Kenneth's home. They observed a broken flat-screen television in the home's entryway. The only other television in the home was an "older-style tube television" in a bedroom. The officers collected the tarp covering Thane's body as evidence, along with a piece of clear plastic sheeting that was found underneath Thane's body.

¶17   DNA testing was performed on both the tarp and the plastic sheeting. A DNA analyst testified at trial that she compared swabs taken from the edges of those items to DNA samples from Thane, Minck, and Minck's girlfriend.

On one of the swabs from the tarp and one of the swabs from the plastic sheeting, the analyst found a mixture of DNA from three individuals, to which Minck was the major contributor and Thane and Minck's girlfriend were excluded as major contributors. The other swabs did not return results suitable to determine a potential major contributor. On cross-examination, the DNA analyst clarified that DNA can remain on an object for "quite some time" and that she could not say when Minck's DNA was deposited on the tarp and plastic sheeting.

¶18 Evidence was also introduced at trial that when Thane's left sock was removed during his autopsy, a small baggie containing a tan substance fell out. Subsequent testing of the substance showed that it contained heroin, fentanyl, and acetyl fentanyl.

¶19 A forensic pathologist testified at trial that Thane's cause of death was mixed drug toxicity. The pathologist explained that Thane's blood had a fentanyl concentration of 42.3 nanograms per milliliter, which was a "significantly elevated level" and could, by itself, have caused Thane's death. In addition, the pathologist testified that Thane's blood contained acetyl fentanyl, methamphetamine, amphetamine, morphine, nicotine, cotinine, and oxycodone. The pathologist explained that acetyl fentanyl is a derivative of fentanyl and indicates "that the fentanyl that the individual ingested was from an illicit source."

¶20 Minck elected to testify in his own defense at trial. He maintained that Thane was supposed to drive him to a scrapyard to buy a car on November 5, 2018, but Thane never arrived. He testified that he recognized the tarp that was covering Thane's body as one of the tarps that he used for yard work. He also testified that the plastic sheeting from underneath Thane's body had been wrapped around his air conditioner and that he would have touched the edges of the

sheeting when placing it around the air conditioner. As a result, Minck stated it did not surprise him that his DNA was found on the tarp and the plastic sheeting.

¶21 Minck denied having any involvement in Thane's death, and he also denied moving or concealing Thane's corpse. Additionally, he denied being in possession of Kenneth's house keys after Kenneth went to jail. He admitted, however, that at some point before Kenneth went to jail, Kenneth had broken his own flat-screen television, and Minck therefore loaned Kenneth one of the two flat-screen televisions from Minck's residence. As noted above, when law enforcement searched the two residences, they found two intact flat-screen televisions in Minck's residence and only a broken flat-screen television in Kenneth's residence.

¶22 During his trial testimony, Minck also admitted obtaining oxycodone pills from a third party without a prescription. He further admitted "giving" ten pills to Thane two weeks before he went missing and "giving" pills to Schofield around November 18, 2018. Schofield similarly testified at trial that sometime around November 18, he purchased 60 oxycodone pills from Minck for $300.

¶23 The jury found Minck guilty of hiding a corpse. The circuit court subsequently sentenced Minck to six years' initial confinement followed by five years' extended supervision on that count. Minck now appeals, arguing that the evidence introduced at trial was insufficient to support his conviction.

## DISCUSSION

¶24 Whether the evidence was sufficient to sustain a guilty verdict in a criminal prosecution is a question of law that we review independently. *State v. Smith*, 2012 WI 91, ¶24, 342 Wis. 2d 710, 817 N.W.2d 410. A defendant "bears a

heavy burden in attempting to convince a reviewing court to set aside a jury's verdict on insufficiency of the evidence grounds." *State v. Booker*, 2006 WI 79, ¶22, 292 Wis. 2d 43, 717 N.W.2d 676. When reviewing the sufficiency of the evidence to support a conviction, an appellate court "may not substitute its judgment for that of the trier of fact unless the evidence, viewed most favorably to the state and the conviction, is so lacking in probative value and force that no trier of fact, acting reasonably, could have found guilt beyond a reasonable doubt." *State v. Poellinger*, 153 Wis. 2d 493, 507, 451 N.W.2d 752 (1990).

¶25 It is the function of the jury, not this court, to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *Id.* at 506. "Thus, when faced with a record of historical facts which supports more than one inference, an appellate court must accept and follow the inference drawn by the trier of fact unless the evidence on which that inference is based is incredible as a matter of law." *Id.* at 506-07.

¶26 Ultimately, if any possibility exists that the jury could have drawn the appropriate inferences from the evidence adduced at trial to find the defendant guilty, then we may not overturn the jury's verdict, even if we believe the jury should not have found guilt based on the evidence before it. *Id.* at 507. The standard for reviewing the sufficiency of the evidence is the same regardless of whether the evidence against the defendant is direct or circumstantial. *Id.* at 501.

¶27 As relevant to this appeal, WIS. STAT. § 940.11(2) states that whoever "hides or buries a corpse, with intent to conceal a crime … is guilty of a

Class F felony."[5]  To convict Minck of this offense, the State needed to prove two elements: (1) that Minck hid a corpse; and (2) that Minck hid a corpse with intent to conceal a crime.  *See* WIS JI—CRIMINAL 1194 (2024).  Minck argues that the evidence at his jury trial was insufficient to satisfy either of these elements.  For the reasons that follow, we disagree.

## I. The evidence was sufficient for the jury to find, beyond a reasonable doubt, that Minck hid Thane's corpse.

¶28     On appeal, Minck does not dispute that the evidence at trial was sufficient to establish that *someone* hid Thane's corpse, for purposes of WIS. STAT. § 940.11(2).[6]  Instead, Minck argues that the evidence was insufficient to establish that *he* was the person who hid Thane's corpse.  We conclude, however, that there was ample circumstantial evidence from which the jury could find, beyond a reasonable doubt, that Minck was the person who hid Thane's corpse.

¶29     For instance, the State introduced strong evidence at trial that placed Thane near Minck's residence at the time of his disappearance on November 5, 2018.  That afternoon, Thane told Tyrone that he was going to drive to Minck's residence to acquire heroin.  Thereafter, Thane's phone used cell phone towers that tracked his movement from Gilmanton to Eau Claire, where Minck lived.  Thane's phone records showed that he spoke with Minck at 4:57, 4:58, and

---

[5] The statute also criminalizes hiding a corpse for other purposes.  *See* WIS. STAT. § 940.11(2).  In this case, however, the State's theory was that Minck hid Thane's corpse with intent to conceal a crime.

[6] Using a "standard dictionary definition," this court has interpreted the verb "hides" in WIS. STAT. § 940.11(2) as meaning "to put or keep out of sight."  ***State v. Badker***, 2001 WI App 27, ¶25, 240 Wis. 2d 460, 623 N.W.2d 142 (citation omitted).  Minck does not dispute that the evidence at his jury trial was sufficient to show that Thane's corpse was hidden—that is, put or kept out of sight—for purposes of § 940.11(2).

4:59 p.m. on November 5. The phone records further showed that the last phone call Thane answered was a call from Tyrone at 5:14 p.m. that day. Traffic camera footage from an intersection one and one-half blocks from Minck's residence showed Thane's vehicle, with its distinctive amber light still attached, driving through the intersection at 5:25 p.m. and traveling in the direction of Minck's home. Beginning at 5:31 p.m. on November 5, all incoming calls to Thane's cell phone went to voicemail.

¶30 After that point, Thane was missing for approximately one month. Although Minck told law enforcement that he unsuccessfully tried to call Thane after Thane failed to arrive at Minck's residence on November 5, 2018, Thane's phone records showed that was not true, as there were no calls from Minck to Thane's phone after their last conversation at 4:59 p.m. that day.

¶31 Law enforcement ultimately found Thane's corpse inside the unoccupied residence of Minck's brother Kenneth, who lived in the other half of the duplex where Minck resided. Thane's corpse had been covered in a tarp, and plastic sheeting was found underneath his corpse. Minck admitted at trial that he owned both of those items. Minck's DNA was found on swabs taken from the edges of both the tarp and the plastic sheeting. Thane and Minck's girlfriend were excluded as major contributors to the DNA mixture found on those swabs.

¶32 In addition, the State introduced evidence supporting a reasonable inference that Minck had access to Kenneth's residence during the month in which Thane was missing. Specifically, the evidence showed that Kenneth was jailed before Thane went missing and was not released until after law enforcement found

Thane's corpse. Kenneth testified that before he went to jail, he threw his keys on Minck's coffee table, in front of Minck's girlfriend.[7]

¶33 Evidence regarding the three flat-screen televisions in the two residences further suggested that Minck had access to Kenneth's residence during the relevant time period. Namely, Minck testified at trial that he had loaned Kenneth one of his two flat-screen televisions after Kenneth broke his own flat-screen television. When searching the two residences, however, the police found a broken flat-screen television in Kenneth's home and two intact flat-screen televisions in Minck's home. That evidence permitted a reasonable inference that Minck retrieved one of his televisions from Kenneth's residence while Kenneth was in jail, which would show that Minck did have access to Kenneth's residence.

¶34 Furthermore, at the end of his second interview with law enforcement, although Minck did not object to the detectives searching his own residence, he attempted to dissuade them from searching Kenneth's home. The jury could reasonably infer that if Minck truly lacked access to Kenneth's residence and was unaware that Thane's corpse was inside it, he would have had no reason to try to dissuade the detectives from searching Kenneth's residence.

¶35 Based on all of this evidence, the jury could easily find beyond a reasonable doubt that Minck was the person who hid Thane's corpse. In arguing to the contrary, Minck asserts that the State failed to prove that he had exclusive

---

[7] Minck emphasizes his own testimony that he did not have possession of Kenneth's house keys after Kenneth went to jail. The jury, however, was not required to accept Minck's testimony in that regard, particularly in light of Kenneth's testimony that he threw his keys on Minck's coffee table in front of Minck's girlfriend before going to jail. *See* ***State v. Poellinger***, 153 Wis. 2d 493, 504, 451 N.W.2d 752 (1990) ("The credibility of the witnesses and the weight of the evidence is for the trier of fact." (citation omitted)).

access to Kenneth's residence during the time when Thane was missing. In particular, Minck asserts that because the police gained access to Kenneth's residence through an unlocked window, "anyone could have gained access to [Kenneth's] home" in the same fashion.

¶36      The State was not, however, required to prove that Minck had *exclusive* access to Kenneth's residence during the relevant time period. Instead, to convince the jury beyond a reasonable doubt that Minck was the person who hid Thane's corpse, the State needed only to prove that Minck had access to Kenneth's residence—that is, the residence of his own brother—and therefore could have hidden Thane's corpse inside it. The evidence summarized above was sufficient to permit the jury to draw that inference. Under the totality of the circumstances, the jury could reasonably disregard the theoretical alternative possibility that an unknown individual gained access to Kenneth's residence using the unlocked window, snuck Thane's corpse into Kenneth's residence (presumably without Minck noticing), and placed a tarp and plastic sheeting with Minck's DNA on them around the corpse.

¶37      Minck also asserts that the State's argument regarding the flat-screen televisions improperly invited the jury to speculate about facts not in evidence. He emphasizes that there was "no testimony from anyone identifying the broken [television] or the two [televisions] in Minck's residence as being the [televisions] Minck was referencing in his testimony" and "no testimony that either of those two [televisions] were in [Kenneth's] residence after November 5, 2018." Even absent such testimony, the jury could reasonably infer from Minck's testimony and from the locations of the televisions on December 6, 2018, that Minck entered Kenneth's residence at some point after Kenneth went to jail to retrieve the television that he had previously loaned to Kenneth. That inference would permit

13

a finding that Minck had access to Kenneth's residence during the relevant time period and, accordingly, could have hidden Thane's corpse there.

¶38    Finally, Minck asserts that the presence of his DNA on the tarp and plastic sheeting does not support a determination that he hid Thane's corpse because he testified that he owned and previously used those items.   Minck apparently believes that, in light of his testimony in that regard, the jury was required to conclude that his DNA was present on the tarp and sheeting as a result of innocent activities.  That was one inference that the jury could have drawn from the evidence presented; however, the jury was not required to draw that inference. *See Poellinger*, 153 Wis. 2d at 506 ("[T]he trier of fact is free to choose among conflicting inferences of the evidence and may, within the bounds of reason, reject that inference which is consistent with the innocence of the accused." (emphasis omitted)).  Despite Minck's testimony regarding his innocent use of the tarp and sheeting, the jury was free to infer from the DNA test results—particularly where Minck's DNA was found on the edges of the tarp and sheeting where a person would have grabbed them, and when viewed in conjunction with the other trial evidence—that Minck used those items when hiding Thane's corpse.

¶39    Consequently, we reject Minck's claim that the evidence at trial was insufficient to prove the first element of the hiding a corpse charge.  We therefore turn to Minck's arguments regarding the second element of that offense.

## II. The evidence was sufficient for the jury to find, beyond a reasonable doubt, that Minck hid Thane's corpse with intent to conceal a crime.

¶40    Minck also argues that the evidence presented at trial was insufficient to establish the second element of the hiding a corpse charge—that is, that Minck hid Thane's corpse with intent to conceal a crime. *See* WIS. STAT.

§ 940.11(2). At trial, the State's theory was that Minck hid Thane's body with intent to conceal Minck's "illegal oxycodone sales." More specifically, in its closing argument, the State posited that Minck hid Thane's corpse after Thane died of a drug overdose at Minck's home because Minck "was maintaining a drug trafficking place at his residence" and "wouldn't have wanted the police" there.

¶41 On appeal, Minck argues that the only crime "that would have been concealed by hiding [Thane's] corpse" would be "a Len Bias-type homicide pursuant to WIS. STAT. § 940.02(2)(a)." *See **State v. Patterson***, 2010 WI 130, ¶37, 329 Wis. 2d 599, 790 N.W.2d 909 (explaining that § 940.02(2)(a), "often referred to as the Len Bias law," created the offense of first-degree reckless homicide by delivery of a controlled substance "as a specific type of criminal homicide to prosecute anyone who provides a fatal dose of a controlled substance"). Minck asserts that Thane's corpse "provided evidence of [Thane's] homicide," which was caused by "the delivery of heroin/fentanyl." Minck further asserts that the State "provided no evidence that Minck delivered heroin/fentanyl" to Thane.[8] Minck therefore argues that Thane's corpse "did not implicate Minck in any crime" and that, as a result, Minck could not have hidden Thane's corpse with intent to conceal a crime for purposes of WIS. STAT. § 940.11(2).

---

[8] In his appellate briefs, Minck actually goes further and asserts that the State "conceded during a jury instruction conference that Minck did not deliver heroin." The record, however, does not support that assertion. Rather, during the jury instruction conference, the parties disputed whether the instruction for the charge of maintaining a drug trafficking place should refer to Minck having sold only oxycodone from his home or also heroin, fentanyl, and/or methamphetamine. The State originally argued that all four substances should be included in the jury instruction, but it ultimately agreed to "just go with the oxycodone."

We do not view these actions by the State as a concession that Minck did not deliver heroin or fentanyl. Instead, it appears that for purposes of the charge of maintaining a drug trafficking place, the State merely decided to proceed with the simpler theory that Minck sold oxycodone from his residence.

15

¶42    In essence, Minck asserts that the crime of hiding a corpse under WIS. STAT. § 940.11(2) can only be committed by a person who hides a corpse in order to conceal the deceased person's homicide.[9]  As the State concedes, there is little case law addressing the crime of hiding a corpse, and there are no published opinions addressing the intent element of that crime.  We agree with the State, however, that Minck's argument regarding the intent element fails because it ignores the plain language of the statute.  *See State ex rel. Kalal v. Circuit Ct. for Dane Cnty.*, 2004 WI 58, ¶45, 271 Wis. 2d 633, 681 N.W.2d 110 ("[S]tatutory interpretation 'begins with the language of the statute.  If the meaning of the statute is plain, we ordinarily stop the inquiry.'" (citation omitted)); *see also State v. Hibbard*, 2022 WI App 53, ¶10, 404 Wis. 2d 668, 982 N.W.2d 105 ("The proper interpretation of a statute presents a question of law that we review independently.").

¶43    By its plain language, WIS. STAT. § 940.11(2) merely requires that a person hide a corpse "with intent to conceal *a* crime."  (Emphasis added.)  The statute does not specify the *type* of crime that the person must intend to conceal.  The legislature could have drafted § 940.11(2) to criminalize hiding a corpse "with intent to conceal a homicide" or "with intent to conceal the deceased person's homicide."  The legislature, however, did not do so.  "We decline to read into the

---

[9] Minck concedes that a person may be convicted of hiding a corpse even if he or she was not the individual who committed the homicide.  *See, e.g.*, *State v. Pinno*, 2014 WI 74, ¶¶25-26, 30, 356 Wis. 2d 106, 850 N.W.2d 207 (recounting that the defendant was convicted of mutilating a corpse after she helped her son dispose of the body of his girlfriend, whom he had killed several weeks earlier).  Minck argues, however, that the defendant must nevertheless act with intent to conceal the homicide, rather than with intent to conceal a different crime.

statute words the legislature did not see fit to write."[10] *Dawson v. Town of Jackson*, 2011 WI 77, ¶42, 336 Wis. 2d 318, 801 N.W.2d 316.

¶44     In support of his argument that a person can violate WIS. STAT. § 940.11(2) only by hiding a corpse with intent to conceal the deceased person's homicide, Minck cites several cases in which individuals were convicted of both hiding a corpse and a homicide offense.[11] *See, e.g.*, *State v. Badker*, 2001 WI App 27, ¶3, 240 Wis. 2d 460, 623 N.W.2d 142.   None of those cases, however, analyzed the intent element of the crime.  The mere fact that defendants have been convicted of hiding a corpse under circumstances where they were also responsible for the deceased person's homicide does not compel a conclusion that a defendant can *only* be convicted of hiding a corpse under those circumstances. As explained above, such a conclusion would be inconsistent with the plain language of § 940.11(2), which merely requires that the defendant act with intent to conceal *a* crime.

---

[10] In his reply brief, Minck suggests that the legislature chose to use the words "with intent to conceal a crime" in WIS. STAT. § 940.11(2) because "it would [have been] impossible to enumerate all of the different homicides or other crimes that would have an evidentiary connection with a corpse."  As noted above, however, the legislature could have chosen to use language such as "with intent to conceal a homicide" or "with intent to conceal the deceased person's homicide."  Alternatively, the legislature could have criminalized hiding a corpse "with intent to conceal a crime with an evidentiary connection to the corpse."  If the legislature had wanted to limit the intent element of § 940.11(2) in that fashion, there were ways for the legislature to do so, short of including a list of specific crimes in the statute.  Moreover, there is a plain, sensible public policy purpose for the legislature to wish to deter, and thereby criminalize, the act of hiding a corpse in an attempt to conceal any crimes, including those not directly related to the victim's death.

[11] In his brief-in-chief, Minck cites two unpublished opinions that were issued before July 1, 2009.  Those citations violated WIS. STAT. RULE 809.23(3), which provides that unpublished opinions generally may not be cited "as precedent or authority," except for authored opinions issued on or after July 1, 2009, which may be cited for their "persuasive value."  We admonish Minck's attorney that future violations of the Rules of Appellate Procedure may result in sanctions. *See* WIS. STAT. RULE 809.83(2).

¶45    Here, the evidence introduced at trial was sufficient to support the jury's determination that Minck hid Thane's corpse with intent to conceal a crime—namely, Minck's drug trafficking.  In his second interview with law enforcement on December 6, 2018, Minck admitted selling oxycodone pills from his home, which he called a "hustle."  At trial, both Minck and Schofield testified that Minck sold Schofield oxycodone on or around November 18, 2018.  Minck also admitted at trial that he gave Thane ten oxycodone pills about two weeks before Thane's disappearance.  Consistent with these admissions, police found various empty pill bottles in Minck's residence, including some that lacked labels. Police also found a glass pipe with methamphetamine residue on it inside Minck's residence.

¶46    This evidence was sufficient to support a finding that Minck was engaged in illegal drug trafficking—and, specifically, in the illegal sale of oxycodone—at the time of Thane's disappearance and death.  In fact, the jury found Minck guilty of delivering Schedule I or II narcotics—namely, oxycodone—and Minck does not challenge the sufficiency of the evidence to support that conviction.  Based on the other evidence introduced at trial, the jury could reasonably infer that Thane died of a drug overdose while at Minck's residence on November 5, 2018.  The jury could further reasonably infer that Minck then hid Thane's corpse with the intent to conceal Minck's illegal drug trafficking because, if Minck had reported Thane's death, law enforcement would have come to Minck's home to investigate and, in the ensuing investigation, may have discovered evidence of Minck's drug sales.  Furthermore, as the State correctly notes, the fact that Minck hid Thane's corpse and then repeatedly denied any knowledge of Thane's whereabouts over the course of the following month "presents powerful evidence of an intent to hide criminal conduct," as does

Minck's attempt to dissuade the officers from searching Kenneth's residence. At no point did Minck present any evidence explaining these circumstances. We agree with the State that, under these circumstances, an "innocent explanation" for Minck's conduct in hiding the corpse "is not apparent."

¶47 Minck nevertheless asserts that the evidence at trial was insufficient to prove that he intended to conceal his illegal drug sales because "[t]he police spoke to Minck two times before [Thane's] body was discovered and both times Minck admitted to selling oxycodone." Minck also cites his admission at trial that he sold oxycodone to Schofield on or around November 18, 2018. Minck therefore asserts that his statements "during the investigation and trial belie any attempt to conceal his oxycodone dealings." As a result, Minck contends that the State "provided no evidence to prove beyond a reasonable doubt that [he] had any intention to conceal his illegal selling of oxycodone."

¶48 This argument is unpersuasive. As an initial matter, we note that Minck's assertion that he admitted selling oxycodone during his first interview with law enforcement on November 13, 2018, is incorrect. Having reviewed that interview, this court has not located any point where Minck admitted selling oxycodone, and Minck does not provide any citation to a specific time during the interview when he made such an admission. To the contrary, during his first interview with law enforcement, Minck specifically denied ever "hook[ing] [Schofield] up with pills," and he also denied that he was planning to give someone 120 pills "for brokering the car deal."

¶49 Minck did admit selling oxycodone during his second interview with law enforcement on December 6, 2018, and during his trial testimony. However, the fact that Minck later admitted selling oxycodone does not mean that he could

not have acted with intent to conceal that illegal conduct when he hid Thane's corpse on or around November 5, 2018—approximately one month before his second interview with law enforcement. What matters is Minck's intent to conceal a crime *at the time he hid Thane's corpse*, not at any subsequent point in time. As the State correctly notes, "Minck cites no authority for th[e] proposition that a defendant can preclude a conviction for hiding a corpse by confessing, at any time, to the crimes that were previously concealed by hiding the corpse."

¶50     For these reasons, we conclude that the evidence at trial was sufficient to support the jury's finding that Minck hid Thane's corpse with intent to conceal a crime—specifically, Minck's illegal drug trafficking. In addition, although we have rejected Minck's argument that a defendant can be convicted of hiding a corpse only when the defendant acted with intent to conceal the deceased person's homicide, we also agree with the State that the evidence at trial was sufficient to support a finding "that Minck did, in fact, hide Thane's corpse to conceal his involvement in [Thane's] death."

¶51     The State introduced evidence at trial that Thane had a heroin addiction and that he told Tyrone he was going to see Minck to acquire heroin on the day he disappeared. Traffic camera footage from near Minck's home showed Thane's vehicle driving toward Minck's residence shortly before Thane went missing. Thane's body was ultimately found in Minck's brother's home, which was the other half of the duplex where Minck lived. Thane's autopsy showed that he died from mixed drug toxicity, although he had a high level of fentanyl in his blood that could have independently caused his death. A baggie containing a tan substance consisting of heroin, fentanyl, and acetyl fentanyl was found on Thane's body. Thane's blood also contained oxycodone—the drug that Minck admitted

selling—and methamphetamine—residue of which was found on a glass pipe inside Minck's residence.

¶52 Based on this evidence, the jury could reasonably infer that Thane died of a drug overdose in Minck's residence and that, thereafter, Minck would have feared being held criminally responsible for Thane's death, even if Minck did not provide Thane with fentanyl or heroin. We agree with the State that

> [t]he jurors did not need to be well-versed in the different gradations of homicide to understand intuitively that a drug trafficker like Minck might panic when a visitor to his home suffered a drug-induced death, particularly if the visitor had consumed the drug trafficker's primary product—oxycodone—just before his death. Thus, the jury could have found that Minck hid Thane's corpse to avoid even his subjectively perceived risk of being held criminally liable for Thane's death.

Notably, WIS. STAT. § 940.11(2) merely requires "that there be an intent, *however ill-conceived or irrational*, to conceal a crime." *See* **State v. Bratchett**, No. 2018AP2305-CR, unpublished slip op., ¶20 (WI App Apr. 22, 2020) (emphasis added). The fact that Minck was never charged with homicide in connection with Thane's death would not prevent the jury from finding, beyond a reasonable doubt, that Minck hid Thane's corpse with the intent to conceal Thane's homicide because Minck feared being charged with that offense.

## CONCLUSION

¶53 For the reasons explained above, we conclude that the State presented sufficient evidence from which a reasonable jury could find, beyond a reasonable doubt, that Minck was the person who hid Thane's corpse. We further conclude that the plain language of WIS. STAT. § 940.11(2) merely required the State to prove that Minck hid Thane's corpse with intent to conceal *a* crime, and

the State was not required to prove that Minck hid Thane's corpse with intent to conceal Thane's homicide. In any event, however, the evidence presented at trial was sufficient to support a finding either that Minck hid Thane's corpse with intent to conceal Minck's illegal drug trafficking or with intent to conceal Thane's homicide. We therefore affirm Minck's conviction for hiding a corpse.

*By the Court.*—Judgment affirmed.

Recommended for publication in the official reports.